# Supreme Court of Florida

_____

No. SC13-1824
_____

**KHADAFY KAREEM MULLENS,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[June 16, 2016]

PER CURIAM.

Khadafy Kareem Mullens pleaded guilty to two counts of first-degree murder for the murders of Mohammad Uddin and Ronald Hayworth, and one count of attempted first-degree murder of Albert Barton. After Mullens waived his right to a penalty phase proceeding by a jury, the trial court sentenced Mullens to death for the murders of Uddin and Hayworth and life imprisonment for the attempted murder of Barton. Mullens now appeals his sentences. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

**FACTS AND PROCEDURAL HISTORY**

The Central Food Mart in St. Petersburg was a convenience store equipped with a visible, but inoperative videocassette recording device (VCR), as well as at least seven other concealed devices that recorded and captured the events that occurred in the store on the evening of August 17, 2008. Spencer Peeples and Mullens entered the store on that evening and initiated a robbery of Uddin, the clerk who was working in the store that evening. Peeples brandished a gun and together with Mullens, demanded money from the cash register. At one point, Peeples tucked his hand into his shirt to prevent his fingerprints from being left on the register. While the three men stood behind the counter as Uddin opened the register, Hayworth entered the store and stood quietly at the counter.

After Peeples and Mullens removed cash from the register, they asked Uddin about the inoperative VCR equipment. Peeples removed the equipment and handed it to Mullens, who placed it in a plastic bag. Peeples returned to the counter, filled another plastic bag with lottery tickets, and handed a small box to Hayworth across the counter at Hayworth's request. Hayworth left the counter to approach the door, but did not exit the store. Peeples and Mullens dragged Uddin from the counter to the entrance of the store and at gunpoint demanded the keys to Uddin's car, but Uddin refused. The three men returned to the counter where Peeples took a green carton of Newport cigarettes and handed it to Mullens, who

placed it in a plastic bag.  As Peeples continued to demand the keys from Uddin, Mullens walked around the store and spoke to Hayworth before returning to the store entrance.  Peeples eventually obtained the keys from Uddin, handed the gun to Mullens, and indicated that he would return shortly with Uddin's car before he exited.

Mullens stood in front of the door and alternatively looked outside the door and back at the counter at Uddin.  When Mullens opened the door and leaned outside, Uddin reached for a telephone and dialed a number.  Mullens saw the movement and ran toward him with the gun pointed at Uddin.  Mullens pushed Uddin back toward the phone and struggled with Uddin before shooting Uddin once in the head.

Mullens then walked away from the counter and grabbed the arm of Hayworth, who had remained in the store but was not standing in front of the door or blocking Mullens's exit.  Mullens pushed Hayworth to the floor and shot him in the head as well.  As Mullens exited the store, he placed the gun in his pocket. Barton then opened the door of the store, but balked as Mullens attempted to pull him into the store.  Barton and Mullens struggled and Mullens fired several shots at Barton.  Barton eventually fell to the ground and crawled away, at which point Mullens abandoned Barton and picked up the bag full of lottery tickets before he exited the store.

After reviewing footage from the operative surveillance equipment, officers issued a "Be On The Lookout" notice with a description of Peeples, Mullens, and Uddin's stolen car. Peeples was arrested driving Uddin's car in the early morning of August 18, and he gave a voluntary statement to officers. Officers also recovered from Uddin's car a cylinder from a revolver and a pack of Newport cigarettes. In his statement, Peeples indicated that he only intended to commit a robbery, not murder. Peeples also consented to a search of his apartment, from which officers recovered the lottery tickets, VCR equipment, and clothing that matched that worn by both of the assailants in the video recordings. Detectives Rodney Tower and Brian Taylor later saw Mullens in an alley and arrested him because they recognized him from the surveillance footage. When Mullens was arrested, officers searched him and found lottery tickets with serial numbers that matched those taken from the store.

On September 4, 2008, a grand jury indicted Mullens and Peeples on two counts of first-degree murder and one count of attempted first-degree murder, although the joint indictments were eventually severed. Between July and September 2011, a hearing was conducted to determine whether Mullens was competent to proceed. Dr. Jill Poorman testified that in her opinion, Mullens was competent to proceed, although Dr. Scot Machlus offered an opinion to the contrary. Dr. Peter Bursten, a psychologist, opined that while Mullens suffered

from antisocial personality disorder, he did not display any symptoms consistent with an Axis I disorder. Bursten also offered an opinion that Mullens was malingering. However, Dr. Machlus testified that in his opinion it would be difficult for someone of Mullens's intelligence level and behavioral patterns to malinger. The trial court orally found that Mullens was competent to proceed. On April 29, 2013, Mullens pleaded guilty to the first-degree murders of Uddin and Hayworth and the attempted first-degree murder of Barton. During the penalty phase, he waived the right to present evidence to a jury,[1] and aggravating and mitigating evidence was received by the trial court.

During the testimony of Detective Tower, the State introduced video recordings and still photographs obtained from the surveillance cameras. Defense counsel objected that the State could not establish a sufficient foundation for this evidence to be admitted through Tower, who did not immediately respond to the crime scene and did not know how the footage was downloaded into an accessible format. Law enforcement personnel from the City of St. Petersburg were initially unable to access the surveillance footage. Tower contacted Robert Dematti of Able Solutions, who assisted law enforcement personnel in retrieving and

---

1. The State objected to Mullens's waiver of a penalty-phase jury. The trial court conducted a colloquy of Mullens and accepted the waiver.

accessing the surveillance footage. The court admitted the material into evidence over the objections of defense counsel.

The State also presented testimony from Detective Taylor, who interviewed eyewitnesses and supervised the search of Peeples's apartment. One witness, Russell Watson, informed Taylor that an individual, later identified as Peeples, had approached him earlier that day, indicated that Peeples was armed, and invited him to participate in the robbery of the Central Food Mart. Watson declined, but observed Peeples enter the convenience store later that day. Another witness informed Taylor that she watched a driver in Uddin's gray Toyota Camry, which had been parked in front of the store that day, drive away from the store, make a U-turn, and return to the store. Officer Willard Smith also testified that the serial numbers of the lottery tickets found in Mullens's possession matched those registered to the Central Food Mart. Dr. Jon Thogmartin, the medical examiner, also testified that the cause of death for both Uddin and Hayworth was a gunshot wound to the head, and that while Uddin lost consciousness immediately, there was a possibility that Hayworth did not. The State did not present testimony from Dematti, who assisted law enforcement with the surveillance footage, or Barton, the surviving witness.

After the State concluded the presentation of penalty-phase evidence, Mullens presented various witnesses in mitigation. Ali Sultan, another local

convenience store owner, testified that he knew Peeples had a reputation for violence and intimidation. He stated that he and Peeples were involved in an ongoing dispute, and on the day of the crimes, Peeples had first come to Sultan's store, looking for Sultan, but Sultan was not there at the time. Sultan also testified that while he did not know Mullens well, he was a known local drug addict who seemed "simple" to Sultan.

Several family members and friends of Mullens also testified with respect to Mullens's childhood and character. During much of Mullens's childhood, Mohammad Ibrahim, his father, was incarcerated, leaving Cassandra Washington, his mother, to care for several children while she completed her education. Cassandra often relied on her oldest child, Shandra, to supervise the children while she worked or attended school. Relatives described Mullens's childhood home as cluttered, decrepit, and lacking food to feed the family. At one point, Cassandra and her family were evicted.

When Ibrahim was released from prison, he offered little support to Mullens, Cassandra, or the rest of the family. He verbally and physically abused Cassandra in front of the children, and when Mullens observed this, he removed his younger sister Kendra from the room. Ibrahim abused drugs and stole food stamps, the household television, and a Mickey Mouse watch from Shandra to purchase drugs.

Additionally, he taught both Shandra and Mullens to shoplift when they were children.

During one of the periods of Ibrahim's incarceration, Cassandra married Levi McClendon, who also had problems with substance abuse. Cassandra testified that McClendon was tougher on Mullens than the rest of the children. Sharon Mullens, the sister of Ibrahim and aunt of Mullens, testified that she did not like the interactions between Mullens and McClendon.

Family members and friends described Mullens as a happy, outgoing, and loving child who was easily manipulated and influenced, especially by his older brother, Wesley. Wesley once directed Mullens to break into a neighbor's garage and steal bicycles. Mullens also cared for his younger sister Kendra and always attempted to make sure that Kendra would not go hungry, even if it required that he steal food for her. Kenneth Mullens, the uncle of Mullens, testified that Mullens was fiercely protective of his family and recounted an incident in which Mullens physically attacked someone who had threatened his cousin during a football game. Kenneth considered taking in Mullens to live with his family, but his wife feared that Mullens would negatively influence their own children.

Mullens was described as an immature child, but when he grew older, he underwent wild mood swings and began to act inappropriately. As a teenager, he asked his mother, who worked at a family planning center, to speak to his

girlfriend about birth control so that she would agree to have sex with him. When he was fifteen, his mother eventually told Mullens that he could no longer live in her home, and he was arrested and incarcerated in an adult facility shortly thereafter. After he was released from prison at the age of sixteen, his demeanor upon his return to Cassandra's home was markedly different. Mullens became angry, hostile, and paranoid. It was difficult to maintain a conversation with him, due to his rapid and discordant speech. Neighbors approached Cassandra, asking her to force him to leave the neighborhood, and she contemplated poisoning her son, "to put him out of his misery."

In addition to behavioral problems, evidence was presented regarding Mullens's substance abuse. Sultan testified that Mullens was one of the local addicts. Cassandra testified that after Mullens was released from prison in 2007 and returned to her home, he used marijuana, and she suspected that he also used cocaine. Michael Wonka, Mullens's roommate at the time of his arrest, testified that they regularly consumed drugs together. Mullens also told Dr. Machlus that he began using drugs when he was eleven years old and began drinking at thirteen, although Dr. Machlus admitted that such reports were not necessarily reliable.[2]

---

2. Dr. Machlus noted that it would be unusual for an individual to begin using cocaine at age eleven, alcohol at thirteen, inhalants at thirteen or fourteen, and marijuana at fifteen, as Mullens reported.

Mullens also presented evidence regarding his mental health. According to testimony from Cassandra Washington, several relatives in her family suffered from mental illness, including diagnoses of schizophrenia, depression, and alcoholism. Ibrahim testified that he suffered from bipolar disorder and post-traumatic stress disorder (PTSD). Dr. Machlus testified that given this family history, Mullens had a genetic predisposition toward certain mental illnesses, which was exacerbated by his own substance abuse. While Mullens was incarcerated in 2007, prior to the murders, he was diagnosed with bipolar I disorder and schizophrenia, Axis I disorders, as well as avoidant personality disorder and independent personality disorders, Axis II disorders. When Dr. Machlus first attempted to evaluate his competency, Mullens acted inappropriately, but after he received medication, Dr. Machlus noted that he became more focused and cooperative. Family members also noted that it became easier to maintain conversations with him. Dr. Machlus opined that Mullens (1) committed the murders while under an extreme emotional or mental disturbance, and (2) acted under the duress of Peeples during the robbery.

Mullens presented evidence of two other proposed mitigating circumstances. Dr. Machlus testified that Mullens informed him that he had been sexually abused by McClendon when he was a child and on eight occasions during a prior incarceration. Both Cassandra and Ibrahim also testified that Mullens exhibited

paranoia regarding sexual abuse after he was released from prison. Ibrahim also testified that he named Mullens after Muammar Gaddafi, whom he respected for opposing the administration of President Reagan.

The trial court issued its sentencing order on August 23, 2013. It found the existence of three aggravating circumstances with respect to each murder: (1) Mullens had been convicted of prior violent felonies under section 921.141(5)(b), Florida Statutes (including a prior conviction for aggravated battery, the contemporaneous murders of Uddin and Hayworth, and the attempted murder of Barton); (2) the capital felonies were committed during the course of a robbery, section 921.141(5)(d), which merged with pecuniary gain, section 921.141(5)(f); and (3) the capital felonies were committed for the purpose of avoiding lawful arrest, section 921.141(5)(e). The court assigned great weight to each aggravating circumstance.

The court found that two statutory mitigating circumstances applied. First, the court concluded that the capital felony was committed while Mullens was under the influence of an extreme mental or emotional disturbance, section 921.141(6)(b), and assigned it moderate weight. The court noted that while Mullens had been diagnosed with bipolar disorder, personality disorder (not otherwise specified), and polysubstance abuse, there was no evidence of Mullens's precise mental state during the murders because Dr. Machlus did not ask Mullens

about his mental state at that time. The court also found that Mullens's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired, section 921.141(6)(f), and assigned it moderate weight. This circumstance was based on the evidence presented by members of his family that detailed his difficult childhood, mental health, history of substance abuse, and the lack of protective factors that might otherwise insulate someone from the negative consequences of such a childhood.

Regarding nonstatutory mitigation, the court explained that of the thirty-one circumstances that Mullens presented as mitigation, sixteen had been addressed as statutory mitigation and would not be reconsidered as nonstatutory mitigation.[3] The court consolidated the remaining factors into nine nonstatutory mitigating circumstances: (1) Mullens was sexually abused as a child and while in prison (not proven and given no weight); (2) his mental illness can be successfully treated (some weight); (3) he is immature, impulsive, and easily manipulated (little

_____

3. These sixteen factors include Mullens's: (1) genetic predisposition to psychological disorders; (2) genetic predisposition to substance dependency; (3) exposure to parental conflict; (4) exposure to and victim of child abuse and neglect; (5) poor parental attachment; (6) exposure to family drug and alcohol abuse; (7) exposure to family criminal behavior; (8) abuse at the hands of his older brother; (9) residential instability; (10) impoverished childhood; (11) poor academic performance; (12) incarceration as a juvenile in an adult facility; (13) diagnosis of bipolar disorder; (14) diagnosis of polysubstance abuse; (15) diagnosis of a personality disorder; and (16) being taught to commit crimes when he was five years old by his father.

weight); (4) he acted under the domination and control of Peeples (some weight); (5) he has a low IQ and poor academic achievement scores (little weight); (6) he accepted responsibility for his crimes (little weight); (7) his family and friends love and support him (little weight); (8) he was "too far gone to be helped" at ten years old (not proven and given no weight); and (9) he was named after Muammar Gaddafi (not mitigating and given no weight).

Upon review of the weight assigned to all of the established aggravating and mitigating circumstances, the court sentenced Mullens to death for the murders of both Uddin and Hayworth, and life imprisonment for the attempted murder of Barton. This review follows.

## DISCUSSION

### Authentication of Surveillance Video Recordings and Photographs

Mullens's principal claim is that the trial court permitted the State to enter into evidence DVDs and still photographs derived from the surveillance footage without first authenticating them. He asserts that Detective Tower was not qualified to authenticate the surveillance footage because Tower did not immediately respond to the crime scene and was unfamiliar with the surveillance equipment. Further, Mullens alleges that the State could have called either Dematti, the technician who assisted law enforcement with the surveillance footage, or Barton, the surviving witness.

We review conclusions by the trial court regarding authentication for abuse of discretion. Coday v. State, 946 So. 2d 988, 1000 (Fla. 2006). The standard required to authenticate evidence first admitted during the penalty phase of a capital trial is a novel issue for this Court. Generally, the proponent of photographic or videographic evidence bears the burden of establishing that the evidence is a fair and accurate representation of the events depicted. See § 90.901, Fla. Stat. (2008). The requirement of authentication is "satisfied by evidence sufficient to support a finding that the document in question is what the proponent claims." Id. We have indicated that authentication for the purpose of admission is a relatively low threshold that only requires a prima facie showing that the proferred evidence is authentic; the ultimate determination of the authenticity of the evidence is a question for the fact-finder. Gosciminski v. State, 132 So. 3d 678, 700 (Fla. 2013). For example, in Gosciminski, we rejected a claim that a receipt was insufficiently authenticated because it did not include specific details regarding the cash register, cashier, or the transaction number. Id. Despite lacking these details, the receipt did contain the store's logo and return policy, as well as details that were corroborated by the testimony of a witness; therefore, it was sufficiently authenticated to be admitted during the guilt phase of a capital trial. Id.

However, the paramount consideration in this case is the fact that evidentiary standards in the sentencing phase of a capital felony are relaxed:

> Upon conviction or adjudication of guilt of a defendant of a capital felony, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death . . . . In the proceeding, evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances . . . . Any such evidence which the court deems to have probative value may be received, <u>regardless of its admissibility under the exclusionary rules of evidence</u>, provided the defendant is accorded a fair opportunity to rebut any hearsay statements. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the Constitution of the State of Florida.

§ 921.141(1), Fla. Stat. (2008) (emphasis added). Therefore, relevant evidence that does not otherwise offend the rights guaranteed to a criminal defendant by the Constitutions of Florida or of the United States is admissible during the penalty phase of a capital trial.

We conclude that the State satisfied its burden to establish that the DVDs were relevant to the penalty phase of Mullens's capital trial. The surveillance footage depicts the events of the robbery, which escalated into the murders of Uddin and Hayworth and attempted murder of Barton. Accordingly, this evidence was relevant to the consideration of the aggravating and mitigating circumstances, particularly the avoid arrest aggravating circumstance that is discussed below. Although Tower admitted that he was not present in the store during the crimes,

nor could he explain the operation of the surveillance footage or the transfer to DVDs, his testimony nonetheless provided a sufficient foundation to support their admission. He testified that after he watched the footage, he was able to identify and apprehend Mullens and Peeples within hours. A search of Peeples's apartment yielded clothing that matched that worn by the assailants in the surveillance footage. Cf. United States v. Cox, 544 Fed. Appx. 908, 912 (11th Cir. 2013) ("If, however, there is independent evidence of the accuracy of the tape recordings admitted at trial, we shall be extremely reluctant to disturb the trial court's decision even though at the time that decision was made the government had not carried its particularized burden of going forward." (citation omitted)).[4] Tower was also present when Dematti from Able Solutions, the business that installed the surveillance footage, arrived at the store and assisted law enforcement in viewing the footage recorded earlier that day. Additionally, the events depicted in the DVDs are internally consistent, and there are no claims that either the DVDs were altered, or the footage mistakenly identified Mullens.

---

4. It should be noted that the court in Cox applied the federal authentication standard, which requires the proponent of photographs or audio recordings to show "(1) the competency of the operator; (2) the fidelity of the recording equipment; (3) the absence of material deletions, additions, or alterations in the relevant part of the tape; and (4) the identification of the relevant speakers." 544 Fed. Appx. at 912 (citation omitted).

Admittedly, the DVDs in this record are not perfect. The video recordings on several of the DVDs freeze, and the video playback of one camera recorded from an exterior vantage point is almost entirely frozen. However, authentication does not require that the evidence in question be perfect, only that the evidence is what the proponent purports it to be. See Gosciminski, 132 So. 3d at 700. Further, such a problem is a problem of credibility, rather than admissibility. Once the DVDs were admitted, it became the task of the fact-finder—here, the trial court—to determine whether the problems with the playback affected the ultimate credibility of the evidence. Cf. id. ("Once a prima facie showing of authenticity is made, the evidence comes in, and the ultimate question of authenticity is for the jury." (citing Charles W. Ehrhardt, Florida Evidence, § 901.1, at 1092-93 (2013 ed.))).

This evidence was clearly relevant to the consideration of the aggravating and mitigating circumstances. Mullens does not assert that he was denied the opportunity to rebut any hearsay statements contained within the footage, nor does he suggest that the admission of the DVDs in any way violated his rights under the Florida or United States Constitutions, which are the only evidentiary limitations expressed in section 921.141(1). In light of the relaxed evidentiary standards of a capital penalty phase, we hold that the trial court did not abuse its discretion regarding the authentication of the DVDs and still photographs.

## Avoid Arrest Aggravating Circumstance

Mullens next alleges that the State failed to prove beyond a reasonable doubt that Mullens's sole or dominant motive to kill Uddin and Hayworth was to eliminate them as witnesses, thereby avoiding arrest. This claim of error is related in part to the authentication of the DVDs, which we have explained were properly admitted into evidence. Mullens also asserts that his behavior as depicted on the recordings, the timing between the shootings, and his various mental health problems all support a reasonable alternative theory that he acted impulsively when he shot and killed Uddin and Hayworth.

When a defendant challenges the aggravation found by the trial court, we review the record to ensure that the trial court applied the correct law and that competent, substantial evidence exists to support the findings of the trial court. Calhoun v. State, 138 So. 3d 350, 361 (Fla. 2013) (citing McWatters v. State, 36 So. 3d 613, 641 (Fla. 2010)). Any errors regarding improper aggravation are reviewed for harmless error. Wilcox v. State, 143 So. 3d 359, 386-87 (Fla. 2014), cert. denied, 135 S. Ct. 1406 (2015); Calhoun, 138 So. 3d at 362.

When the avoid arrest aggravating circumstance is found to apply to victims who are not law enforcement officers, this Court has explained that the State bears a higher burden of proof:

> [T]he State must demonstrate beyond a reasonable doubt that the sole or dominant motive for the murder was witness elimination.

- 18 -

> Hernandez v. State, 4 So. 3d 642, 667 (Fla. 2009); see also Connor v. State, 803 So. 2d 598, 610 (Fla. 2001). In such cases, proof of the intent to avoid arrest or detection must be very strong, and mere speculation on behalf of the State that witness elimination was the dominant motive is insufficient to support the aggravating circumstance. Id.; see also Riley v. State, 366 So. 2d 19, 22 (Fla. 1978). However, it is not necessary for the State to present direct statements by the defendant to establish a motive of witness elimination. Rather, even without direct evidence of the offender's thought processes, the aggravating factor can be supported by circumstantial evidence through inference from the facts shown. Swafford v. State, 533 So. 2d 270, 276 n.6 (Fla. 1988).

Wilcox, 143 So. 3d at 384-85.

This heightened standard of proof requires more than a simple inference that the defendant might have been motivated by the concern to eliminate a witness. See Connor, 803 So. 3d at 610. This aggravating circumstance is not satisfied simply because a victim might have been able to identify the defendant. E.g., Davis v. State, 148 So. 3d 1261, 1278 (Fla. 2014) (citing Farina v. State, 801 So. 2d 44, 54 (Fla. 2001)). We have stricken the avoid arrest aggravating circumstance if the evidence suggests that the defendant killed the victim because: the victim was screaming; the victim was on the phone; or the defendant panicked. Cook v. State, 542 So. 2d 964, 970 (Fla. 1989); Garron v. State, 528 So. 2d 353, 360 (Fla. 1988); Perry v. State, 522 So. 2d 817, 820 (Fla. 1988).

However, when we have concluded that this aggravating circumstance was properly found by the trial court, additional evidence of affirmative conduct of the

defendant to avoid detection often supports the inference that the defendant acted with the intent to eliminate witnesses and avoid prosecution:

> While [the fact that the victims knew and could identify the defendant] alone is insufficient to prove the avoid arrest aggravator, we have looked at any further evidence presented, such as whether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant.

Buzia v. State, 926 So. 2d 1203, 1210 (Fla. 2006) (emphasis omitted); see Jennings v. State, 718 So. 2d 144, 151 (Fla. 1998) (affirming avoid arrest aggravating circumstances because the defendant "used gloves, did not use a mask, and stated that if he ever committed a robbery, he would not leave any witnesses"); see also Cole v. State, 36 So. 3d 597, 607 (Fla. 2010) (approving the avoid arrest aggravating circumstance when the defendant transported a victim before killing the victim); Looney v. State, 803 So. 2d 656, 676-78 (Fla. 2001) (affirming trial court's finding of avoid arrest where the defendant knew the victims well and committed the murders after they had already completed the robbery and secured a getaway vehicle); Foster v. State, 778 So. 2d 906, 918 (Fla. 2000) (affirming avoid arrest aggravating circumstance upon evidence that a group, of which the defendant was a member, decided to kill the victim to prevent the victim from reporting the group to law enforcement); Fotopoulos v. State, 608 So. 2d 784, 792

(Fla. 1992) (concluding that evidence that the victim intended to blackmail the defendant was sufficient to support the avoid arrest aggravating circumstance).

In Consalvo v. State, 697 So. 2d 805, 819 (Fla. 1996), the defendant challenged the trial court's finding of the avoid arrest aggravating circumstance. During trial, a witness testified that Consalvo told him that he shot the victim after she discovered him in her home, threatened to call the police, reached for the phone, and began to scream. Id. We stated that this testimony, along with the facts that the defendant knew the victim and the victim pressed charges against the defendant for an earlier crime, supported the trial court's finding of the avoid arrest aggravating circumstance. Id. Such facts made Consalvo's claim distinguishable from Garron, where the defendant's motive was unclear, and Cook, where the defendant instinctively reacted when he shot the victim. Id. at 819-20.

The only evidence that establishes the avoid arrest aggravating circumstance in this case is the surveillance footage from inside the store. We conclude that the footage provides competent, substantial evidence that supports the findings of the trial court that Mullens acted with the sole or dominant intent to eliminate Hayworth and Barton as witnesses who might identify him to law enforcement. Regarding the murder of Uddin, the surveillance footage reveals that Mullens

quickly shot Uddin after he saw Uddin with a phone in his hand.[5]  We have stricken the avoid arrest aggravating circumstance when the only evidence in support of this circumstance was the fact that the defendant saw the victim with a phone in hand.  Garron, 528 So. 2d at 360 ("The fact that [a potential witness] was on the telephone at the time of the shooting hardly infers any motive on the appellant's part.").  This reaction is distinguishable from Consalvo, where the defendant knew the victim; the victim had intended to prosecute the defendant for an earlier crime; and the victim had actually threatened to call the police.  697 So. 2d at 819-20.  We therefore conclude that the trial court incorrectly applied the law regarding the avoid arrest aggravating circumstance with respect to the murder of Uddin.

However, Mullens's actions following the murder of Uddin indicate that he acted with the primary intention of avoiding arrest and prosecution.  After Uddin was shot, Mullens walked away from Uddin and, instead of exiting the store, Mullens searched for Hayworth, who did not block Mullens's exit.  As the trial court noted in its sentencing order:

> Finding him in one of the store's aisles, the Defendant forcefully grabbed Hayworth's arm and spun him about, getting him into a position where he could be more easily shot.  Hayworth was not resisting the Defendant and was pleading for the Defendant to let him

---

5. The record does not reflect whom Uddin called, or if he even successfully dialed any number.

> live. Ignoring Hayworth's pleas, the Defendant raised the revolver and fired a shot into Hayworth's head. Like Uddin, Hayworth had been passive and submissive during the robbery and remained so up until his death. He had obeyed all orders from the Defendant and Peeples and stood exactly where they told him to during the robbery. Hayworth posed absolutely no threat to the Defendant.

See Farina, 801 So. 2d at 54-55 (noting that victims offered no resistance and did not impede the exit of the defendant in affirming the avoid arrest aggravating circumstance). Further, Mullens began to exit the store and had placed the gun in his pocket when Barton attempted to enter. When Barton hesitated, Mullens grabbed Barton, dragged him into the store, and engaged in an altercation with Barton that resulted in Mullens firing several shots at Barton before Mullens ultimately exited the store. Additionally, Mullens took with him the inoperative surveillance equipment that Peeples had earlier disconnected and removed from its shelf, and neither Mullens nor Peeples wore masks. See Buzia, 926 So. 2d at 1210; Jennings, 718 So. 2d at 151. These actions clearly constitute sufficient circumstantial evidence that Mullens's sole or dominant intent in killing Hayworth and attempting to kill Barton was to eliminate them as witnesses. Therefore, we affirm the finding of the avoid arrest aggravating circumstance.

**Campbell Error**

The next error that Mullens asserts is that the sentencing order issued by the trial court violates the requirements established in Campbell v. State, 571 So. 2d 415, 419 (Fla. 1990), receded from in part by Trease v. State, 768 So. 2d 1050,

1055 (Fla. 2000). He alleges that the trial court failed to address two proposed nonstatutory mitigating circumstances: (1) that he was protective and nurturing of his younger sister, and (2) he was kind and helpful to his roommate. He also asserts that the trial court erred when it refused to consider some of the mitigating factors proposed as nonstatutory mitigation because the court concluded that such evidence qualified as statutory mitigation. He also claims that the court improperly found that the allegations that he had been the victim of sexual abuse were not supported by competent, substantial evidence. We conclude that there is no merit to these claims.

This Court has emphasized the need for trial courts to clearly and expressly delineate findings related to aggravation and mitigation in written sentencing orders. Oyola v. State, 99 So. 3d 431, 446 (Fla. 2012) (citing Campbell, 571 So. 2d at 419-20). This emphasis on procedure enables this Court to conduct a proper and meaningful review of a death sentence on appeal. Walker v. State, 707 So. 2d 300, 319 (Fla. 1997). We review findings of aggravating and mitigating circumstances for competent, substantial evidence. See Ault v. State, 53 So. 3d 175, 187 (Fla. 2010). However, the weight assigned to each circumstance is reviewed for abuse of discretion. E.g., Oyola, 99 So. 3d at 445; Ault, 53 So. 3d at 187. We review any errors made in the sentencing order for harmless error. Ault, 53 So. 3d at 187 (citing Lebron v. State, 982 So. 2d 649, 661 (Fla. 2008));

Singleton v. State, 783 So. 2d 970, 977 (Fla. 2001). An error made during the penalty phase is harmless if there is no reasonable possibility that a lesser sentence would have resulted without the error. Rogers v. State, 511 So. 2d 526, 535 (Fla. 1987) (citing State v. DiGuilio, 491 So. 2d 1129, 1138 (Fla. 1986)).

In Campbell, we held that a trial court must clearly consider whether each proposed mitigating circumstance (1) is actually mitigating in nature; and (2) has been established by the preponderance of the evidence. 571 So. 2d at 419; see Oyola, 99 So. 3d at 446. The court then must assign weight to every established mitigating and aggravating circumstance and weigh the aggravating and mitigating circumstances in determining whether the death penalty is the appropriate punishment. Campbell, 571 So. 2d at 419-20. We later clarified that the court may conclude that a particular mitigating circumstance exists, but assign it no weight. Trease, 768 So. 2d at 1055. In this analysis, a trial court is also permitted to aggregate several related nonstatutory mitigating circumstances. Gonzalez v. State, 136 So. 3d 1125, 1166 (Fla.), cert. denied, 135 S. Ct. 193 (2014); Ault, 53 So. 3d at 194. Indeed, the Court indicated in Campbell that it is preferable for trial courts to aggregate proposed nonstatutory factors into categories of related conduct. 571 So. 2d at 419 n.3.

The trial court below found that the State had proven beyond a reasonable doubt three aggravating circumstances: prior violent felony (great weight);

committed during the course of a robbery, merged with pecuniary gain (great weight); and avoid arrest (great weight). The court noted that the prior violent felony included both an earlier conviction for aggravated battery and convictions for the murders of Uddin and Hayworth and the attempted murder of Barton. It also found that Mullens established two statutory mitigating circumstances: (1) Mullens committed the crimes under the influence of an extreme emotional or mental disturbance (moderate weight); and (2) his capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law was substantially impaired (moderate weight). The court made the following findings with respect to nonstatutory mitigating circumstances: (1) Mullens was sexually abused as a child and while in prison (not established; no weight); (2) his mental illness can be treated (some weight); (3) he is immature, impulsive, and easily manipulated (little weight); (4) he acted under the domination and control of Peeples (some weight); (5) he has a low IQ and poor academic achievement scores (little weight); (6) he took responsibility for his crimes (little weight); (7) he has loving and supportive family and friends (little weight); (8) his family members considered him to be "too far gone" by the age of ten years old (not proven; no weight); and (9) his father named him after Muammar Gaddafi (not mitigating; no weight).

Number of Proposed Mitigating Circumstances

Mullens asserts that the court failed to address two proposed nonstatutory mitigating circumstances: (1) that he was protective and nurturing of his sister Kendra; and (2) that prior to his arrest, he was kind and helpful to his roommate Michael Wonka. Relatedly, Mullens alleges an apparent inconsistency regarding the number of proposed mitigating circumstances that violates Campbell. Mullens submitted a sentencing memorandum that proposed thirty-five nonstatutory mitigating circumstances, but the sentencing order reported thirty-one proposed nonstatutory mitigating circumstances.[6] Although the sentencing order does not

_____

6. The thirty-five factors that Mullens proposed were: (1) his genetic predisposition to psychological disorders; (2) genetic predisposition to substance dependency; (3) exposure to parental conflict; (4) exposure to and victim of child abuse and neglect; (5) poor parental attachment; (6) exposure to family drug and alcohol abuse; (7) exposure to family criminal behavior; (8) abuse at the hands of his older brother; (9) residential instability; (10) impoverished childhood; (11) poor academic performance; (12) incarceration as a juvenile in an adult facility; (13) diagnosis of bipolar disorder; (14) diagnosis of polysubstance abuse; (15) diagnosis of a personality disorder; (16) low IQ; (17) low academic achievement scores; (18) low cognitive scores; (19) sexual abuse by his stepfather; (20) victim of sexual battery while incarcerated; (21) being taught to commit crimes when he was five years old by his father; (22) his mental illness can be successfully treated; (23) he took responsibility for his crimes by pleading guilty; (24) he took responsibility for his crimes by waiving a sentencing recommendation by a jury; (25) he did not initiate or plan the robbery; (26) Peeples provided the gun; (27) Mullens's immaturity; (28) impulsivity; (29) he is gullible and easily manipulated; (30) he acted under the domination and control of Peeples; (31) he has the love and support of many family members and friends; (32) he was protective of and nurturing to his younger sister, Kendra; (33) he was kind and helpful to Michael Wonka; (34) by the age of ten years old, his relatives thought he was "too far gone

address the discrepancy regarding the number of proposed nonstatutory mitigating circumstances, the trial court explained that proposed factors numbers one through fifteen and 21 had been considered and addressed as statutory mitigation. The remaining factors were consolidated into the following nine categories: (1) the sexual abuse he allegedly suffered; (2) his mental illness; (3) his immaturity, impulsivity, and ability to be manipulated; (4) the fact that he acted under the influence of Peeples; (5) his low IQ and poor achievement scores; (6) the fact that he took responsibility for his crimes because he pleaded guilty and waived the right to an advisory sentence by a jury; (7) the fact that he has loving and supporting friends and family; (8) the fact that some of his relatives thought he was "too far gone" to be helped when he was ten years old; and (9) the fact that his father named him after Muammar Gaddafi.

We hold that Mullens is not entitled to relief on this claim. The trial court aggregated several related nonstatutory factors into general categories for its consideration, which was permissible. See Gonzalez, 136 So. 3d at 1166; Ault, 53 So. 3d at 194. The court did not overlook the proposed circumstance that Mullens was kind and helpful to Wonka, but in fact referenced the testimony of Wonka as part of the general nonstatutory category that Mullens has loving and supportive

---

to be helped"; and (35) his father named him after Muammar Gaddafi, whom his father respected.

friends and family. This factor was assigned little weight. Regarding Mullens's

relationship with his sister, Kendra, it appears that the trial court considered this to

be part of the statutory mitigation that Mullens's capacity to appreciate the

criminality of his conduct or to conform his conduct to the requirements of law

was substantially impaired, although the court did not indicate that this

circumstance was one of the sixteen circumstances already considered as statutory

mitigation.[7] In finding that this statutory mitigating circumstance applied, the

court referenced the impoverished childhoods that Mullens and his siblings

endured, as well as the abuse inflicted on Mullens, his mother, and his siblings by

Mullens's father. Because the court did consider the effects that Mullens's

difficult childhood had on himself and his family as mitigation, we conclude that

any error by the trial court in overlooking Mullens's relationship with his late sister

Kendra is harmless, particularly in light of the fact that the trial court found the

existence of three aggravating circumstances and assigned great weight to each.

See Sparre v. State, 164 So. 3d 1183, 1198 (Fla. 2015) (concluding that a

potentially overlooked mitigating circumstance was harmless in light of the

evidence of guilt and established aggravating circumstances).

---

7. Mullens's relationship with Kendra was not apparently encompassed by the general nonstatutory category that Mullens "has loving and supportive family and friends" who testified that they will continue to support Mullens during his incarceration because Kendra had passed away before Mullens's trial.

With respect to the discrepancy in the number of proposed nonstatutory mitigating circumstances, we conclude that any error is also harmless.  See Merck v. State, 975 So. 2d 1054, 1066 n.5 (Fla. 2007) (noting that factual errors in sentencing orders are reviewed for harmless error).  Other than the two allegedly absent factors considered above or the errors discussed below, Mullens does not indicate which specific nonstatutory mitigating circumstances the trial court may have overlooked.  Although the trial court found that two statutory mitigating circumstances were established, each meriting moderate weight, and seven established nonstatutory mitigating factors ranging from none to some weight, such mitigation did not outweigh the great weight assigned to each of three aggravating circumstances.  We therefore conclude that there was no reasonable possibility that a lesser sentence would have been imposed in the absence of such an error.

Refusal to Reconsider Statutory Mitigation as Nonstatutory Mitigation

Mullens also claims that the court improperly refused to consider sixteen proposed nonstatutory mitigating circumstances.  In its sentencing order, the court stated that it had already considered these mitigating circumstances in finding the existence of two statutory mitigating circumstances.  Accordingly, the court refused to find that those mitigating circumstances qualified as nonstatutory mitigation as well.

Although a trial court must evaluate established mitigating circumstances, Mullens offers no support for his claim that a trial court must reconsider evidence as nonstatutory mitigation after the court has already concluded that such evidence qualifies as statutory mitigation. In Ault, the trial court rejected the defendant's contention that his mental health qualified as either statutory or nonstatutory mitigation. 53 So. 3d at 189. On review, this Court affirmed the rejection of this evidence as statutory mitigation, but concluded that the trial court erred when it then refused to consider such evidence as nonstatutory mitigation. Id. at 188-90 ("However, the rejection of statutory mental health mitigation did not require the trial court to reject brain damage as an independent nonstatutory mitigating factor.").[8]

In Oyola, this Court also held that the trial court's mitigation analysis was insufficient. 99 So. 3d at 446-47. There, the trial court concluded that Oyola's mental health issues did not rise to the level of statutory mitigation, and provided the following analysis regarding nonstatutory mitigation: "The alleged non-statutory mitigation included serious drug abuse, an abusive home life as a child, created a cycle of violence, and mental disorder. While the evidence did establish such circumstances, the Court only gives such circumstances slight weight in

---

8. The Court in Ault ultimately concluded that this error, along with other sentencing errors, was harmless. 53 So. 3d at 196.

weighing the aggravating circumstances against the mitigating circumstances." Id. We explained that such a cursory review of the mitigating evidence failed to meet the specific sentencing procedure articulated in Campbell. Id. at 447.

However, these cases do not support Mullens's claim that a Campbell error occurred below. Unlike Ault, the trial court below accepted the proposed evidence as statutory mitigation and simply did not recount that evidence again as nonstatutory mitigation as well. The error in Oyola emerged because the trial court failed to detail its conclusions regarding mitigation. Essentially, Mullens asks this Court to require a trial court to "double count" mitigating evidence that has already been found to have established statutory mitigation as nonstatutory mitigation as well, something this Court has not yet mandated.

Furthermore, we have previously indicated that the proportionality analysis that we perform following an appropriately detailed sentencing order by the trial court is not a simple matter of counting the number of aggravating circumstances against the mitigating circumstances; rather, this is a qualitative analysis. See Brown v. State, 143 So. 3d 392, 407 (Fla.), cert. denied, 135 S. Ct. 726 (2014); Muehleman v. State, 3 So. 3d 1149, 1166 (Fla. 2009). Therefore, there is no purpose to be served by requiring trial courts to recount factors as both statutory and nonstatutory mitigation. We conclude that the trial court did not err in refusing

to find that the factors that supported Mullens's statutory mitigation also qualified as nonstatutory mitigation.

## Allegations of Sexual Abuse

Mullens also insists that the trial court erred when it improperly concluded that no competent, substantial evidence supported the nonstatutory mitigating circumstance that he was sexually abused as a child and as an adult in prison. We disagree.

Although a trial court must consider and weigh each established mitigating circumstance, it may reject a proposed mitigating factor if the record lacks competent, substantial evidence to support that circumstance. Coday, 946 So. 2d at 1001-03. A trial court may even reject uncontroverted expert opinion testimony regarding proposed mitigating evidence if that opinion is unsupported by the record. Hoskins v. State, 965 So. 2d 1, 16-17 (Fla. 2007); Nelson v. State, 850 So. 2d 514, 530 (Fla. 2003); Philmore v. State, 820 So. 2d 919, 935-37 (Fla. 2002); Foster v. State, 679 So. 2d 747, 755 (Fla. 1996). For example, in Philmore, this Court approved the rejection by the trial court that the defendant suffered from an extreme mental or emotional disturbance during the commission of the capital crime after the State extensively cross-examined the expert witness for the defense. 820 So. 2d at 937; see also Nelson, 850 So. 2d at 530 (affirming rejection of expert opinion largely derived from defendant's self-reporting of hallucinations and

- 33 -

depression). We have also found that the omission of allegations of sexual abuse submitted as nonstatutory mitigation was harmless because the only evidence of this allegation was testimony from the defendant's father, who indicated that he only learned of the alleged abuse several years later. Caylor v. State, 78 So. 3d 482, 497-98 (Fla. 2011) ("The appellant himself never testified regarding the allegation and never gave any description of the abuse or how it may have affected him.").

The sentencing order in this case provides the following analysis with respect to this issue:

> The Defendant alleges that he was sexually abused as a child by his step-father and that he was also sexually abused while incarcerated in prison. However, no competent evidence was presented during the penalty phase to substantiate these claims. Accordingly, the Court finds that this non-statutory mitigation has not been proven and therefore accords it no weight.

During the penalty phase, Mullens presented testimony from Dr. Machlus, who informed the court that Mullens reported to him that he was sexually abused by his stepfather as a child and on eight separate occasions while incarcerated. However, Dr. Machlus admitted during cross-examination that Mullens had failed to report these allegations prior to the interview, which was conducted during the course of Mullens's competency evaluation. He also admitted that Mullens may have been malingering, which was consistent with similar suggestions proffered by other experts during the competency hearing. Thus, the record provides a basis to

- 34 -

question the validity of Dr. Machlus's conclusions. See Philmore, 820 So. 2d at 937; Nelson, 850 So. 2d at 530.

Additionally, although other witnesses for Mullens testified that they suspected that he had been sexually assaulted by his stepfather and while he was incarcerated, such testimony only amounted to speculation. Indeed, one such witness, Mullens's father Ibrahim, admitted that it was difficult to pinpoint exactly when he first suspected that Mullens had been sexually abused in prison because Ibrahim himself was incarcerated for much of the relevant period of Mullens's life and because he was high on drugs during his intermittent periods of freedom. We therefore agree with the trial court's finding that there was no competent, substantial evidence in the record to support this mitigating circumstance. Moreover, to the extent that the trial court failed to detail the specific reasons that it did not find that this mitigating circumstance had been proven—i.e., the lack of credibility of Dr. Machlus's conclusions and the speculative nature of the testimony offered by Mullens's family members—we conclude that any error is harmless. See Caylor, 78 So. 3d at 497-98.

The sentencing order provided by the trial court was detailed and it extensively reviewed the facts of the crimes, as well as the aggravating and mitigating circumstances before the court. The court explained why it found that certain aggravating and mitigating circumstances had been established (or not),

assigned weight to each established circumstance, and weighed the aggravation and mitigation before it sentenced Mullens to death, as Campbell requires. Although sentencing orders must provide sufficient detail to enable this Court to conduct a meaningful review, see Ault, 53 So. 3d at 187, there is by no means a requirement that a sentencing order must pedantically or repeatedly address each individual factor proposed as mitigation.  See Campbell, 571 So. 2d at 419 n.3 ("As with statutory mitigating circumstances, proposed nonstatutory circumstances should generally be dealt with as categories of related conduct rather than as individual acts.").  We therefore conclude that the sentencing order satisfied the requirements of Campbell and reject Mullens's assertions of error.

## Proportionality

Mullens also claims that the death sentence is not proportionate for the crimes committed because he asserts that the murders resulted from a robbery gone awry.  As noted above, this is a qualitative evaluation of the reasons for the established aggravating and mitigating circumstances.  Brown, 143 So. 3d at 407; Muehleman, 3 So. 3d at 1166.  Accordingly, we consider all of the aggravating and mitigating circumstances in comparison to similar cases where we have upheld the death penalty.  McLean v. State, 29 So. 3d 1045, 1052 (Fla. 2010).  Additionally, the Court accepts the weight assigned to the aggravating and mitigating

circumstances, unless there is no competent, substantial evidence to support such a finding. Hayward v. State, 24 So. 3d 17, 46 (Fla. 2009).

When it appears that a murder has occurred in the course of a "robbery gone wrong," we have on some occasions concluded that the death penalty is disproportionate. E.g., Yacob v. State, 136 So. 3d 539, 550-52 (Fla. 2014); Jones v. State, 963 So. 2d 180, 187-88 (Fla. 2007) (vacating death penalty because only a single aggravating circumstance remained); Larkins v. State, 739 So. 2d 90, 95 (Fla. 1999) (noting the extensive mental health evidence presented as mitigation); see also Urbin v. State, 714 So. 2d 411, 417 (Fla. 1998) (finding the fact that the defendant was a minor at the time of the crime to be "particularly compelling" (citing Livingston v. State, 565 So. 2d 1288 (Fla. 1988)). Relatedly, this Court has indicated that where only a single valid aggravating circumstance exists, a sentence of death may be inappropriate. See Green v. State, 975 So. 2d 1081, 1088 (Fla. 2008) ("[A]bsent unusual circumstances, death is not indicated in a single-aggravator case where there is substantial mitigation."); Jones, 963 So. 2d at 189.

Mullens insists that this case is similar to Yacob, in which we held that the death penalty was not proportionate. 136 So. 3d at 550. In that case, the defendant entered a convenience store and initiated a robbery. Id. at 541. During the course of the robbery, he asked the clerk if the security camera had any videotape or CD that recorded store activity. Id. The clerk answered in the negative, and as Yacob

- 37 -

prepared to exit the store, the clerk reached for a switch to automatically lock the doors of the store. Id. In response, Yacob shot at the clerk before ultimately finding a different point of exit from the store. Id. During sentencing, the trial court found the existence of two aggravating circumstances, commission during the course of a robbery and pecuniary gain, which merged into a single aggravating circumstance. Id. at 544. Rather than qualify as one of the most aggravated and least mitigated murders, the Court concluded that this murder instead was the result of a botched robbery and held that the death penalty was disproportionate. Id. at 550-52.

However, we consider Yacob to be distinguishable for several reasons. First, in finding the sentence in Yacob to be disproportionate, this Court noted that the facts of Yacob were similar to cases that resulted from botched robberies and that were also found to be disproportionate. 136 So. 3d at 550-52 (citing Scott v. State, 66 So. 3d 923, 925 (Fla. 2011); Johnson v. State, 720 So. 2d 232, 236 (Fla. 1998); Sinclair v. State, 657 So. 2d 1138, 1142-43 (Fla. 1995); Thompson v. State, 647 So. 2d 824, 827 (Fla. 1994)). Notably, Yacob and the cases upon which it relied involved only one count of first-degree murder. See id.[9] Likewise, in other cases in which we have found the death penalty to be disproportionate because we

_____

9. The defendant in Thompson was also convicted of attempted first-degree murder. 720 So. 2d at 233.

concluded that the first-degree murders resulted from a botched robbery, the defendant killed only one victim.  See Jones, 963 So. 2d at 181, 184; Larkins, 739 So. 2d at 91-92; Urbin, 714 So. 2d at 413.  By contrast, the fact that Mullens committed two counts of first-degree murder and attempted to commit a third count of first-degree murder after he and Peeples had completed the robbery distinguishes this case from other cases that involved "robberies gone wrong."

Additionally, we reversed the sentence in Yacob in part because there was only a single valid aggravating circumstance.  See 136 So. 3d at 552.  Even if we were to strike the avoid arrest aggravating circumstance here, two aggravating circumstances, prior violent felony and that the murders were committed during the course of a robbery, would remain.  Therefore, this case is not one in which only a single valid aggravating circumstance exists, which might support the imposition of a life sentence.  See Green, 975 So. 2d at 1088.

Rather, we conclude that this case is closer to McLean, 29 So. 3d 1045, and Troy v. State, 948 So. 2d 635 (Fla. 2006), in which we affirmed the imposition of the death penalty.  In McLean, the trial court found the existence of three aggravating circumstances—the defendant was on felony probation at the time of the capital offense; prior violent felony, including both a contemporaneous conviction and a prior conviction for armed robbery; and the murder was committed during the course of a robbery.  29 So. 3d at 1049.  The court also

found the same two statutory mitigating circumstances that were found in this case, as well as six categories of nonstatutory mitigation, but concluded that the aggravation outweighed the mitigation. Id. at 1049-50. Similarly, we upheld the sentence of death in Troy, after the trial court found four aggravating circumstances—the murder was especially heinous, atrocious, and cruel; prior violent felony; committed by a defendant under community control; and committed during the course of a sexual battery and robbery—the same two statutory mitigating circumstances, and sixteen nonstatutory mitigating circumstances. 948 So. 2d at 654-55.

Here, the trial court concluded that the great weight assigned to each of three aggravating circumstances outweighed the established mitigation. We conclude that competent, substantial evidence supports the findings of the trial court regarding aggravation and mitigation. Therefore, we affirm the imposition of the death penalty in this case.

**Sufficiency**

Although Mullens does not raise the issue, this Court has an independent obligation to review the record for competent, substantial evidence that supports his convictions. E.g., Brown, 143 So. 3d at 407 (citing Blake v. State, 972 So. 2d 839, 850 (Fla. 2007); Fla. R. App. P. 9.142(a)(5)). However, when a defendant pleads guilty to a capital offense, this Court instead must consider whether that

plea was knowing, intelligent, and voluntary. Tanzi v. State, 964 So. 2d 106, 121 (Fla. 2007) (citing Winkles v. State, 894 So. 2d 842, 847 (Fla. 2005); Lynch v. State, 841 So. 2d 362, 375 (Fla. 2003)).

After a competency hearing in 2011, in which the court found that Mullens was competent to proceed, Mullens was represented by counsel and pleaded guilty on April 29, 2013. During a colloquy with the court, Mullens stated that he understood that by pleading guilty to two counts of first-degree murder, he faced either death or life imprisonment. The court confirmed that Mullens understood that he chose to waive his right to have a jury decide his guilt and recommend an advisory sentence. The State also provided a factual basis for two counts of first-degree murder and one count of attempted murder, and the court accepted the plea. See Russ v. State, 73 So. 3d 178, 199-200 (Fla. 2011) (finding the defendant's guilty plea was knowingly, intelligently, and voluntarily made). Therefore, we conclude that the plea was knowingly, intelligently, and voluntarily made, and it provides competent, substantial evidence to support Mullens's convictions.

**Written Order of Competency**

Finally, Mullens insists that this matter must be remanded to the trial court for a written order of competency. Florida Rule of Criminal Procedure 3.212(b) requires a trial court to consider a defendant's competency before proceeding further. "If the court finds the defendant competent to proceed, the court shall

enter its order so finding and shall proceed." Fla. R. Crim. P. 3.212(b); <u>see also</u>

Fla. R. Crim. P. 3.212(c)(7) (applying identical language for competency

determinations where a defendant has been found competent after having been

previously committed for treatment). The district courts of this state have

interpreted this language to require a written order of competency; when a trial

court has issued only an oral finding of competency, the district courts have

typically remanded for a nunc pro tunc written order of competency. <u>See, e.g.</u>,

<u>Williams v. State</u>, 130 So. 3d 763, 764 (mem.) (Fla. 2d DCA 2014); <u>Razuri v.

State</u>, 126 So. 3d 261, 261-62, n.1 (mem.) (Fla. 3d DCA 2010); <u>Molina v. State</u>,

946 So. 2d 1103, 1105 n.1 (Fla. 5th DCA 2006); <u>White v. State</u>, 548 So. 2d 765,

768 (Fla. 1st DCA 1989); <u>see also</u> <u>Boone v. State</u>, 805 So. 2d 1040, 1041 (Fla. 4th

DCA 2002) (remanding for written order of competency, but not specifying a nunc

pro tunc order). Additionally, this Court recently indicated that a trial court must

delineate its findings regarding the competency of the defendant in a written order.

<u>Dougherty v. State</u>, 149 So. 3d 672, 676, 679 (Fla. 2014) (noting that the claim in

that case was procedurally barred because the defendant first raised the issue in a

postconviction proceeding nearly seven years after his initial competency

proceeding, but reviewing the competency procedures outlined in Florida Rules of

Criminal Procedure 3.210-3.212).

The State insists that Mullens waived his right to seek a written competency order through his plea agreement. We disagree. The plea agreement entered into between Mullens and the State indicates that Mullens waived his "right to appeal the facts of the case." The trial court orally found Mullens to be competent on September 16, 2011, and neither party disputes his competency. Mullens's request that this case be remanded for a nunc pro tunc written order of competency does not seek to challenge the facts of this case. Therefore, we remand this matter to the trial court for the entry of a written order of competency, nunc pro tunc to September 16, 2011.

## Hurst

During the pendency of Mullens's appeal, the United States Supreme Court issued its decision in Hurst v. Florida, 136 S. Ct. 616 (2016). The Court held that Florida's capital sentencing scheme violated the Sixth Amendment under Ring v. Arizona, 536 U.S. 584 (2002). Following that decision, Mullens requested leave to file supplemental briefing to address the effects of Hurst on his appeal, which we granted.

We need not extensively consider the implications of Hurst to determine that Mullens cannot avail himself of relief pursuant to Hurst. Hurst said nothing about whether a defendant could waive the Sixth Amendment right to jury factfinding in sentencing procedures as recognized by Ring and Apprendi v. New Jersey, 530

- 43 -

U.S. 466 (2000). In light of the fact that Mullens waived this right, his argument that his sentence must be commuted to life imprisonment pursuant to section 775.082(2), Florida Statutes (2008), fails.

Although the United States Supreme Court has not directly addressed whether a defendant can waive his or her rights to jury factfinding in the specific context of capital sentencing, the Court has concluded that defendants are free to waive the general right to jury factfinding that was recognized in Apprendi:

> [N]othing prevents a defendant from waiving his Apprendi rights. . . .
> If appropriate waivers are procured, States may continue to offer
> judicial factfinding as a matter of course to all defendants who plead
> guilty. Even a defendant who stands trial may consent to judicial
> factfinding as to sentence enhancements, which may well be in his
> interest if relevant evidence would prejudice him at trial.

Blakely v. Washington, 542 U.S. 296, 310 (2004). Even more broadly, it has long been recognized that defendants may entirely waive their right to a jury trial. E.g., Singer v. United States, 380 U.S. 24, 32-35 (1965); Patton v. United States, 281 U.S. 276, 308 (1930), abrogated on other grounds by Williams v. Florida, 399 U.S. 78 (1970); State v. Upton, 658 So. 2d 86, 87 (Fla. 1995).

Other states have reached similar conclusions in the context of capital sentencing. In states where defendants who pleaded guilty to capital offenses automatically proceeded to judicial sentencing, courts have held that Ring did not invalidate their guilty plea and associated waiver of jury factfinding. State ex rel. Taylor v. Steele, 341 S.W.3d 634, 646-47 (Mo. 2011); State v. Piper, 709 N.W.2d

783, 803-07 (S.D. 2006) (citing Colwell v. State, 59 P.3d 463 (Nev. 2002); Moore v. State, 771 N.E.2d 46 (Ind. 2002)); State v. Downs, 604 S.E.2d 377, 380 (S.C. 2004); State v. Murdaugh, 97 P.3d 844, 852-54 (Ariz. 2004); see also Lewis v. Wheeler, 609 F.3d 291, 309 (4th Cir. 2010) (refusing to grant federal habeas corpus relief pursuant to Ring, explaining that "neither Apprendi nor Ring holds that a defendant who pleads guilty to capital murder and waives a jury trial under [Virginia's] capital sentencing scheme retains a constitutional right to have a jury determine aggravating factors"). These courts reasoned that the defendants knew that when they entered a guilty plea, they fully forfeited their right to a jury trial. Taylor, 341 S.W.3d at 647-48; Colwell, 59 P.3d at 474; Moore, 771 N.E.2d at 49. A subsequent change in the law regarding the right to jury sentencing did not render that initial waiver involuntary. Murdaugh, 97 P.3d at 853 (citing Brady v. United States, 397 U.S. 742 (1970)). Moreover, where defendants have strategically chosen to proceed before a judge alone in order to avoid a death sentence, their jury waivers have been upheld. Taylor, 341 S.W.3d at 647-48; Murdaugh, 97 P.3d at 853.

Unlike the capital sentencing schemes at issue in Taylor, Piper, Colwell, Moore, Downs, and Lewis, in Florida, a defendant who pleaded guilty to a capital offense retained the right to present mitigating evidence to a jury, which, prior to Hurst, would issue an advisory sentence. See § 921.141(1), Fla. Stat. (2008). As

- 45 -

with a guilty plea, in which a defendant waives his or her right to a jury determination of guilt, a waiver of the right to jury sentencing will be upheld if that waiver is knowingly, voluntarily, and intelligently made.  Winkles v. State, 21 So. 3d 19, 23 (Fla. 2009) (citing Grim v. State, 971 So. 2d 85, 101 (Fla. 2007)); Griffin v. State, 820 So. 2d 906, 912 (Fla. 2002).

In this case, Mullens waived his right to jury sentencing after he pleaded guilty to two counts of first-degree murder.  Moreover, the State contested this waiver, although it recognized that Mullens had that right and the trial court could, in its discretion, accept or reject his waiver.[10]  The trial court conducted a thorough colloquy and asked Mullens if he understood the right that he was relinquishing and that he was subject to sentences of either death or life imprisonment.  The trial court was fully cognizant of Mullens's status and his background.  After the persistent questions by the trial court, the following exchange occurred:

> [MULLENS]:  Sir, it seem[s] like you keep asking the same thing like I'm making the wrong decision or something.
>
> THE COURT:  No.  I'm just making sure so the record's clear that you've talked about it enough and that you're comfortable that you're making the right decision for you.

---

10.  See, e.g., Grim, 971 So. 2d at 101 (explaining that a trial court may exercise discretion in convening a jury for sentencing purposes, even if the defendant has validly waived the right to an advisory jury) (citing Muhammad v. State, 782 So. 2d 343, 361 (Fla. 2001); State v. Carr, 336 So. 2d 358, 359 (Fla. 1976)).

[MULLENS]: I'm absolutely positive, sir.

THE COURT: Okay. All right. . . .

(Emphasis added.) Upon review of this record, we conclude that Mullens's waiver was knowing, voluntary, and intelligent.

If a defendant remains free to waive his or her right to a jury trial, even if such a waiver under the previous law of a different jurisdiction automatically imposed judicial factfinding and sentencing, we fail to see how Mullens, who was entitled to present mitigating evidence to a jury as a matter of Florida law even after he pleaded guilty and validly waived that right, can claim error. As our sister courts have recognized, accepting such an argument would encourage capital defendants to abuse the judicial process by waiving the right to jury sentencing and claiming reversible error upon a judicial sentence of death. Piper, 709 N.W.2d at 808 (citing People v. Rhoades, 753 N.E.2d 537, 544 (Ill. 2001)). This we refuse to permit. Accordingly, Mullens cannot subvert the right to jury factfinding by waiving that right and then suggesting that a subsequent development in the law has fundamentally undermined his sentence. We reject his claim that his sentence should be commuted to life imprisonment.

## CONCLUSION

We conclude that Mullens knowingly, intelligently, and voluntarily pleaded guilty to the charged offenses. Additionally, Mullens is not entitled to relief on

- 47 -

any of the errors that he alleges. We also determine that Mullens is not entitled to relief pursuant to Hurst. Therefore, we affirm his sentences and remand for entry of a written order of competency, nunc pro tunc to September 16, 2011.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, and PERRY, JJ., concur.
PARIENTE, J., concurs with an opinion.
LEWIS, J., specially concurs with an opinion, in which LABARGA, C.J., and PARIENTE, J., concur.
CANADY, J., concurs in result with an opinion, in which POLSTON, J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

I concur in the affirmance of the defendant's conviction and death sentence. The defendant entered a plea of guilty for the tragic murder of two victims and the attempted murder of a third victim—all of whom he shot at close range. The grim sequence of the robbery and ensuing murders was documented by the convenience store's security camera. The defendant, who was twenty-four years old at the time of the murders, waived a penalty phase before a jury. I agree that the defendant knowingly, voluntarily, and intelligently waived his right to a jury trial, and that therefore the defendant "cannot avail himself to relief pursuant to Hurst." Majority op. at 43.

- 48 -

I write only to highlight, as demonstrated through the trial court's excellent sentencing order, the sentencing judge's profound understanding of how Mullens's dysfunctional upbringing influenced the person he became as an adult:

> However, while the Court firmly believes that the Defendant was well aware of the criminality of his actions, competent evidence was presented that suggests that the Defendant's ability to conform his conduct to the requirements of law was substantially impaired. In addition to Dr. Machlus's testimony regarding the Defendant's mental health, the Court also heard testimony from several of the Defendant's family members regarding his upbringing. The totality of their testimonies painted a very bleak picture of the Defendant's childhood and background.

> The Defendant's father was incarcerated in prison for the majority of the Defendant's life. However, during the periods of his release, his father admitted to brutally beating the Defendant's mother in front of the Defendant and his siblings, and to also viciously beating the children themselves. Like his father, the Defendant's brother also took to inflicting violence on the Defendant, horribly beating him on several occasions. In addition to these beatings, the Defendant's father was constantly seeking out narcotics and abusing them in front of the Defendant. His father would often steal household funds as well as others' property to pay for drugs and alcohol. The Defendant was no older than five when his father taught him how to shoplift in order to supply the family with food and other items they needed. Similarly, the Defendant's mother was an alcoholic who abused both alcohol and marijuana in the presence of the Defendant. His parents' addictions led to a lack of residential stability and inadequate resources to supply food, clothes or utilities, forcing the Defendant and his siblings to go without these items.

> The testimony from the Defendant's family members made clear that throughout his formative years, the Defendant was exposed to severe physical and emotional abuse, rampant alcohol and drug abuse and lessons on how to commit crimes. Compounding the effects of the Defendant's childhood is the lack of any "protective factors." Dr. Machlus testified that the Defendant did not have any of

- 49 -

the protective factors that would typically insulate an individual from experiencing the negative consequences of such an upbringing.

Additionally, when the Defendant was sixteen years old he was sentenced to prison. The Defendant's mother testified that when he returned from prison, the Defendant was "very different," and that he had become "angry" and "paranoid." She testified that his behavior worsened to the point that their neighbors were concerned enough to start a petition to have Defendant removed from the neighborhood. Having tried to convince the Defendant to seek professional help and failing, even the Defendant's mother thought his condition had become so irrevocable that she believed he would have been better off dead.

Furthermore, both Dr. Machlus and the Defendant's mother testified as to the Defendant's predisposition to psychological disorders and substance abuse. It was well established that the Defendant's lineage is saturated with individuals who suffered not only from psychological disorders, but also severely abused drugs and alcohol. As previously noted, Dr. Machlus testified that individuals who suffer from both Bipolar Disorder and substance abuse are six times more likely to commit violent criminal acts as opposed to those individuals who suffer solely from Bipolar Disorder. Given the Defendant's mental health and substance abuse history, family upbringing and lack of protective factors, it is evident that the Defendant lacks the ability to conform his conduct to the requirements of law.

While the Court has no doubt that the Defendant was well aware of the criminality of his actions, it is the combination of the Defendant's mental health and substance abuse issues along with his upbringing that indicate the Defendant lacked the capacity to conform to the requirements of law. In light of the foregoing, the Court finds that this factor has been proven and accords it moderate weight.

As long as we continue to have a death penalty in Florida, we will see that many of the defendants who sit on death row have backgrounds similar to the history and life of Khadafy Kareem Mullens. While Mullens's multiple traumas,

- 50 -

including his numerous adverse childhood experiences, serve as substantial non-statutory mitigation, I cannot disagree with the trial court's weighing of the aggravating circumstances against the mitigating circumstances, nor with our conclusion that the death sentence in this case was proportional, and agree that this case is dramatically different from Yacob v. State, 136 So. 3d 539, 550-52 (Fla. 2014), a case we reduced to life. Accordingly, I concur in the affirmance of Mullens's conviction and death sentence.

LEWIS, J., specially concurring.

I agree with the conclusions reached by the Court today. However, I write to express my concern that this decision should not in any way be understood to eliminate or undermine the legal procedures regarding the admission of nontestimonial evidence. See Johnson v. State, 660 So. 2d 637, 645 (Fla. 1995) ("The rules of evidence may be relaxed during the penalty phase of a capital trial, but they emphatically are not to be completely ignored."); see also § 921.141(1), Fla. Stat. (2008) ("[T]his subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the Constitution of the State of Florida.")

Courts in Florida have held that authentication of surveillance footage during the determination of guilt is satisfied upon the testimony of an individual, such as an employee or business owner, who was familiar with the installation and

operation of the surveillance equipment.  Dragani v. State, 759 So. 2d 745, 746 (Fla. 5th DCA 2000) quashed in part on other grounds, 791 So. 2d 1083 (Fla. 2001); Dolan v. State, 743 So. 2d 544, 546 (Fla. 4th DCA 1999).  Additionally, in Wagner v. State, 707 So. 2d 827, 830 (Fla. 1st DCA 1998), the First District held that authentication was satisfied upon testimony from a police officer who installed, operated, and explained the chain of custody of a video camera.  However, no court in Florida has concluded that authentication of evidence that proves the guilt of a defendant can be satisfied only upon the testimony of an officer who was familiar with the investigation, but ultimately could not verify the reliability of the recording device.  I would caution trial courts against relying on the decision today to support such an evidentiary ruling made outside the context of the sentencing phase of a capital trial.

Rather, the conclusions reached today must be considered in the relatively rare context that this defendant pleaded guilty to a capital offense and waived the right to an advisory sentence by a jury of his peers.  Additionally, there were absolutely no allegations that the surveillance footage was materially altered, nor is there any suggestion that law enforcement officers mistakenly identified Mullens after viewing the footage.  Many of the evidentiary restrictions in the Florida Evidence Code, including the requirement that evidence must be authenticated before it can be admitted, exist to prevent juror confusion and to guarantee

criminal defendants the right to a fair trial.  See, e.g., § 90.403, Fla. Stat. (2008) (excluding relevant but unduly prejudicial or confusing evidence); § 90.802, Fla. Stat. (2008) (generally excluding hearsay evidence).  When there are no jurors to potentially confuse and the defendant has conceded his or her guilt, relevant, nontestimonial evidence that is not otherwise of questionable origin is admissible during a penalty phase of a capital trial.  See § 921.141(1), Fla. Stat.

However, the fact that evidence need only be relevant during the sentencing phase of a capital trial should not be interpreted to mean that trial courts can or should admit evidence that is patently unreliable.  The definition of relevant evidence is "evidence tending to prove or disprove a material fact."  § 90.401, Fla. Stat. (2008).  Further, authentication is central to the understanding of relevancy:

> The authentication requirement may be viewed as an aspect of relevancy.  In a contract action, for example, evidence in the form of a writing is relevant as proof of the actual terms of an alleged agreement only if it is shown to be the very document to which the parties somehow manifested their assent, or at least a true copy of that document.  In this sense, it is actually [Federal Rule of Evidence] 401 and [Federal Rule of Evidence] 402 that impose the requirement to authenticate, for these provisions define relevancy and make it a condition of admissibility.

Christopher B. Mueller & Laird C. Kirkpatrick, 5 Federal Evidence § 9.2 (4th ed. 2015) (emphasis added).  Therefore, it follows that evidence that is obviously unreliable, fabricated, or of unknown origin is necessarily irrelevant.

Accordingly, the proponent of nontestimonial, non-self-authenticating evidence cannot simply proffer for admission such evidence alone to establish its relevancy. For example, this Court has held that in the absence of evidence linking a given weapon to the charged offense, the weapon itself is irrelevant and inadmissible. Agatheas v. State, 77 So. 3d 1232, 1236 (Fla. 2011) (holding that it is insufficient to establish the relevancy of a particular gun by simply introducing it and instead requiring the prosecution to somehow link that gun to the crime). Likewise, the foundation for photographic and videographic evidence can be established either through the testimony of a witness with knowledge under the pictorial testimony theory of admission, or upon additional proof of the reliability of the recording under the silent witness theory. Hannewacker v. City of Jacksonville Beach, 419 So. 2d 308, 311 (Fla. 1982); Bryant v. State, 810 So. 2d 532, 536 (Fla. 1st DCA 2002) (citing Charles W. Ehrhardt, Florida Evidence, § 401.2 at 114 (2001 ed.)); Dolan, 743 So. 2d at 545-46.

In this case, the testimony of Detective Tower—who responded to the crime scene, arrested Mullens after viewing the surveillance footage, and testified after Mullens admitted his guilt—provided a sufficient foundation for the admission of the surveillance footage. I therefore concur in the decision of the Court.

LABARGA, C.J., and PARIENTE, J., concur.

CANADY, J., concurring in result.

I agree with the decision to affirm the convictions and sentences. But I disagree with the conclusion that the "trial court incorrectly applied the law regarding the avoid arrest aggravating circumstance with respect to the murder of Uddin." Majority op. at 22. Contrary to the unelaborated assertion in Garron v. State, 528 So. 2d 353, 360 (Fla. 1988), when a victim is slain while attempting to make a phone call during the course of a robbery, a strong inference arises that the defendant first concluded that the phone call was likely being made to summon the police and then acted against the victim to thwart phone contact with the police and thereby to avoid arrest for the robbery. The imputation of another motive to the defendant in such circumstances can only be produced by a flight of fancy. I also disagree with remanding for a written order on competency, which is an unnecessary and useless act.

POLSTON, J., concurs.

An Appeal from the Circuit Court in and for Pinellas County,
        Philip James Federico, Judge - Case No. 522008CF018029XXXXNO

Howard L. Dimmig, II, Public Defender, and Cynthia Jean Dodge, Assistant Public Defender, Tenth Judicial Circuit, Bartow, Florida,

        for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Timothy Arthur Freeland, Assistant Attorney General, Tampa, Florida,

        for Appellee