DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**KENNETH WILLINGHAM,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-1883

[March 31, 2021]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Laura Johnson, Judge; L.T. Case No. 17CF007320AMB.

Carey Haughwout, Public Defender, and Nancy Jack, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and MaryEllen M. Farrell, Assistant Attorney General, West Palm Beach, for appellee.

MAY, J.

The defendant appeals his conviction and sentence on charges of robbery with a firearm and felon in possession of a firearm. He raises eight issues, which we find lack merit. We write, however, to address issues four and eight. In issue four, the defendant argues the trial court erred in admitting video surveillance tapes from the shopping center where the robbery took place. In issue eight, the defendant argues the trial court erred in sentencing him to life in prison as statutorily mandated because the sentence is unconstitutional. We disagree with him on both issues and affirm. We affirm on the remaining issues without further comment.

The State charged the defendant with one count of robbery with a firearm and one count of felon in possession of a firearm. The charges arose when the defendant approached the store manager with a gun as he stood outside of his place of employment, a Metro PCS store. The defendant forced the store manager to enter the store and open the register. The store manager identified the man that pointed a gun to his back in the surveillance video.

The information alleged that in July 2017, the defendant took money from a Metro PCS store by use of force or violence while carrying a firearm. The State obtained surveillance video from the cameras placed inside the Metro PCS store and around the shopping center. Before trial, the defense moved in limine to exclude the surveillance videos and law enforcement testimony about the videos' contents. The defense argued law enforcement could not testify about the videos' contents because they did not personally witness the crime. The trial court granted the motion regarding the testimony, but denied it as to the video surveillance tapes.

At trial, a sales representative testified she had just parked at the shopping center when she saw a stocky, African American man running from the direction of the Metro PCS store toward a dark-colored SUV. She confirmed that a portion of the surveillance footage accurately depicted her vehicle and the man she saw running to the SUV. She also testified the man was shirtless and wearing jeans, but his face was covered. She saw him leaving the store, but she did not see a gun.

The store manager noted the robber was masked and had a firearm. He believed the person had socks on his hands and saw "like small dreads at the end by his neck." After the store manager handed him the money, the robber told him and another store clerk to walk into the bathroom, count to ten, and then leave.

The store manager did as he was told. After counting to ten, he came out of the bathroom and walked outside the store. He saw a black SUV driving away and heading north on Federal Highway. The store manager called the police.

When law enforcement reviewed the surveillance video from the shopping center's cameras, they saw a black SUV consistent with the description given by the store manager and sales representative. The SUV was a black Lincoln Navigator.

The lead detective testified he obtained the license tag number from the surveillance video. The video showed a dark SUV with a white piece of paper attached to it. He tracked the car to a rental company. Law enforcement used GPS information to locate the car. The car was found inside an apartment complex in the Victoria Woods area, close to the defendant's girlfriend's home. Police found a white piece of paper behind the car's windshield, near the driver's side.

The girlfriend testified she was dating the defendant at the time of the offense. They both drove the Lincoln Navigator. They rented the car

"under the table" in Miami.  The police impounded the car down the street from her residence.

The girlfriend further testified that at the time of the offense, she worked as a security guard.  Her boss provided her with a firearm.  She would not allow the defendant to touch the gun, but admitted she would leave it in her room where the defendant would sometimes sleep.

The police confiscated the gun.  A detective testified the gun in the surveillance video was the same make and model as the gun taken from the girlfriend's house.

The detective obtained a warrant for the defendant's cell phone records.  Investigators learned from those records that the defendant called the girlfriend's number several times immediately after the robbery.  Law enforcement also obtained information from the Lincoln Navigator's GPS and Bluetooth systems.  The information showed that, on the day of the robbery, between 9:00 a.m. and 11:15 a.m., the defendant's phone made ten phone calls to the girlfriend's phone number.

The Lincoln Navigator's GPS system confirmed the car travelled from the Victoria Woods complex to the Metro PCS store on the day of the robbery.  According to the GPS information, the car then travelled north on Federal Highway.  The investigators obtained cell phone tower information that was consistent with the information obtained from the Lincoln Navigator's GPS system.

The jury found the defendant guilty as charged.  The trial court found the defendant qualified as a Prison Releasee Reoffender ("PRR") and sentenced him to a mandatory term of life in prison with a ten-year minimum for carrying a firearm.  From his conviction and sentence, the defendant now appeals.

- ***The Metro PCS and Shopping Center Surveillance Films***

The State's Exhibit 1 contained video footage recorded by cameras placed around the shopping center and inside the Metro PCS store.  The store owner explained he called the shopping center's owner, who then gave him a code to access the storage area in the back of the building.  Boynton Beach police officers were with him when he retrieved the center's surveillance video.

Before the State introduced Exhibit 1, defense counsel argued the footage from the shopping center's outside cameras was not properly authenticated:

> **Defense Counsel:** We would be objecting to the videos. The witness just testified that he has sixteen video cameras inside the store, two outside. The ones around the building were managed by the [shopping center], not him. Without being an eyewitness to the crime, he can't testify whether there is a fair and accurate representation, and no other witness has done that.

The State argued the videos were admissible under the silent witness theory. It explained that all the store owners had access to the center's surveillance videos:

> **Trial Court:** He pulled the videos from where? Where do the outside videos come from? Were they somebody else's or were they under his care and control?
>
> **State:** It's not necessarily under his—well, I think all of the businesses have the ability to pull the videos. That's what it is. Because the owner of the plaza gives them permission.
>
> **Trial Court:** You don't have to have—you'll have to clarify that.
>
> **State:** All right.

The State continued its examination and asked the store owner how he gained access to the center's surveillance cameras and if he had done anything to distort the videos. The store owner explained how he obtained the videos and denied doing anything to them. The trial court then admitted the State's Exhibit 1 in its entirety.

The defendant argues on appeal that the trial court abused its discretion in admitting the shopping center's surveillance videos because they were not properly authenticated. He claims the error was harmful because the State used the video to identify the defendant and the Lincoln Navigator's tag number. He suggests the videos should have been authenticated by a witness responsible for the videotape system.

The State responds that video evidence can be authenticated, even if the State does not call the video's creator. The video's distinctive

4

characteristics and content, in conjunction with the circumstantial evidence, are sufficient to authenticate the video. Finally, the State argues the trial court properly admitted the evidence based on the silent witness theory because the video was reliable.

"The standard of review for a trial court's determination regarding authentication of evidence is abuse of discretion." *State v. Torres*, 304 So. 3d 781, 782 (Fla. 4th DCA 2020) (citing *Mullens v. State*, 197 So. 3d 16, 25 (Fla. 2016)).

We have held that "the ultimate determination of the authenticity of evidence is a question for the fact-finder, and that 'authentication for the purpose of admission is a relatively low threshold that only requires a prima facie showing that the proffered evidence is authentic.'" *Id.* at 783 (quoting *Lamb v. State*, 246 So. 3d 400, 408 (Fla. 4th DCA 2018)). Evidence may be authenticated based on circumstantial evidence, extrinsic evidence, or by showing that it meets the requirements for self-authentication. *See id.*

Here, the State made a prima facie showing that the shopping center's surveillance video footage was authentic. The store manager testified the videos were a fair and accurate representation of what happened that day. The sales representative testified the video footage accurately depicted her vehicle and the man running to the SUV. Similarly, the store manager testified he saw a dark SUV consistent with the surveillance video. The footage obtained from the store's inside cameras was consistent with the shopping center's outside footage. The State established the footage was reliable.

The footage had a time and date stamp. The store owner testified a passcode is needed to access the shopping center's video recordings and he did not edit or tamper the recordings. And, law enforcement personnel were present when he retrieved the footage. *See Richardson v. State*, 228 So. 3d 131, 136 (Fla. 4th DCA 2017) (holding surveillance video was properly authenticated where video included date and time stamp, there was no evidence video was tampered with, and video was kept in a locked office).

In sum, the State authenticated the video surveillance tapes. The trial court did not abuse its discretion in admitting them into evidence.

- *The Mandatory Sentence Imposed*

The defendant argues the mandatory life sentence based on the PRR

statute violates the constitutional prohibition against cruel and unusual punishment because he committed the past qualifying offense when he was a juvenile. Although he was 16 when he committed the predicate offense, he was 25 when he committed the current offense.

The defendant relies on *Graham v. Florida*, 560 U.S. 48 (2010), where the United States Supreme Court held the Eighth Amendment prohibits imposing a life without parole sentence on juvenile offenders not convicted of homicide. He claims *Graham* and its progeny should apply with equal force to offenders in their early twenties. The State responds that *Graham* cannot be extended by this court and the defendant therefore is not entitled to relief.

Review of a sentence in the context of a constitutional violation is de novo. *Guzman v. State*, 68 So. 3d 295, 297 (Fla. 4th DCA 2011). "However, when considering Eighth Amendment issues, appellate courts must yield 'substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishment for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals.'" *Andrews v. State*, 82 So. 3d 979, 984 (Fla. 1st DCA 2011) (footnote omitted) (quoting *Solem v. Helm*, 463 U.S. 277, 290 (1983)).

The PRR statute provides that one who commits one of the enumerated felonies, including robbery, within three years of release from a corrections facility, qualifies as a PRR. § 775.082(9)(a)1.g., Fla. Stat. (2016). Once the State establishes the defendant as a PRR, a trial court may no longer sentence the defendant under the sentencing guidelines, but rather must sentence under the PRR statute. *Id.* § 775.082(9)(a)3. For a felony punishable by life—as is the robbery with a firearm charge in this case—the defendant must be sentenced to life imprisonment. *Id.* § 775.082(9)(a)3.a.

Under the PRR statute, the trial court was therefore required to sentence the defendant to life imprisonment. The State established the defendant as a PRR under the statute, and the felony he committed within the three years of his release was punishable by life.

While the defendant's argument is compelling, we are bound by the statute's plain language. As Judge Ciklin noted in a similar case:

> Although [the defendant]'s argument is thoughtful and forceful, reversal is simply not supported by the current state of the law. . . . However, criminal justice reform is gaining popularity around the country, including with the passage of

6

the Federal First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018), which is largely aimed at recidivism reduction. In light of this federal shift toward reform, perhaps the Florida Legislature will in the future consider exclusion of sentences served for underage crimes from qualifying under recidivist statutes, or at least grant sentencing judges the discretion to decline to apply such statutes where a predicate offense was committed by a juvenile.

*Morris v. State*, 290 So. 3d 1022, 1024 (Fla. 4th DCA 2020) (Ciklin, J., concurring). Until then, there is no judicial discretion to impose a different sentence.

For the foregoing reasons, we affirm and decline to address the remaining issues raised.

*Affirmed.*

GERBER and KUNTZ, JJ., concur.

\*     \*     \*

***Not final until disposition of timely filed motion for rehearing.***

7