DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ARKHEEM J. LAMB,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D17-545

[May 2, 2018]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Glenn D. Kelley, Judge; L.T. Case No. 502016CF004626A.

Carey Haughwout, Public Defender, and Siobhan Helene Shea, Special Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Jessenia J. Concepcion, Assistant Attorney General, West Palm Beach, for appellee.

GERBER, C.J.

The defendant appeals from his convictions, arising from a carjacking, for grand theft of a vehicle and grand theft. The defendant primarily argues that the trial court erred in permitting the state to introduce into evidence a Facebook video showing the defendant sitting in the stolen car and wearing the victim's stolen watch just hours after the carjacking occurred. We find no error in any of the trial court's decisions arising from the Facebook video's use at trial. Therefore, we affirm the convictions.

We present this opinion in the following sections:
A. The trial:
   1. The carjackings;
   2. The investigation;
   3. The Facebook video.
B. Our review of the defendant's arguments:
   1. The discovery objection;
   2. The authentication objection;
   3. The best evidence objection; and
   4. The motion for judgment of acquittal.

## A. The Trial

The trial involved two separate carjackings, occurring just a few hours apart and about thirty miles apart. The jury convicted the defendant on the charges arising from the first carjacking, but acquitted him of the charges arising from the second carjacking. We will describe both carjackings because the evidence was intertwined.

### 1. The Carjackings

Around 10:00 p.m., the first victim was sitting in his car near a hotel in Jupiter. A man opened the first victim's door, put a gun to the first victim's head, and told the first victim to get out. A second man approached, and a pickup truck pulled up. The two men pushed the first victim to the ground and drove off in the first victim's car. The pickup truck followed. The men, besides taking the first victim's car, also took the first victim's phone, watch, wallet, and cash, including Cuban money.

Sometime after 1:00 a.m. that night in Greenacres, located about thirty miles south of the Jupiter hotel, the second victim pulled his car into an apartment complex. Two men then approached, one with a silver gun. The men took the second victim's phone and other items, and drove away in the second victim's car. Then a car matching the description of the first victim's car drove past the second victim, with the driver's side window partially rolled down. That car's driver said something to the second victim before driving away behind the second victim's car. The second victim could not see what that driver looked like or whether other people were in the car.

The following morning, both victims' cars were found in the same area in a city located between Jupiter and Greenacres. Both the first victim's phone and the second victim's phone were found in the first victim's car. The first victim's watch, wallet, and cash were missing.

### 2. The Investigation

A Jupiter police detective investigated the first carjacking at the Jupiter hotel. A Palm Beach County sheriff's detective investigated the second carjacking in Greenacres. The detectives came into contact with each other because the carjackings were similar.

The first victim identified two of the codefendants as the carjackers. However, the first victim did not identify the defendant as one of the carjackers or one of the persons inside the pick-up truck.

The second victim also identified one of the codefendants as the carjacker holding the gun. However, the second victim did not identify the defendant as the other carjacker or one of the persons inside the car matching the description of the first driver's car.

The detectives determined that the codefendants did not live in Jupiter, so the detectives pieced together the codefendants' connections to each other. During that investigation, the detectives found that the defendant and codefendants had connections to each other from being stopped by law enforcement on prior occasions. They all lived in the city where the cars were found.

The detectives obtained a search warrant for one of the codefendant's phones. On that phone, the detectives found pictures of that codefendant holding a silver gun matching the gun used in the carjackings. When one of the other codefendants was arrested, he possessed a silver gun matching the gun used in the carjackings.

### 3. *The Facebook Video*

The Jupiter police department also found on the codefendant's phone a Facebook video showing both stolen cars. The detectives showed the Facebook video to the first victim before trial.

At trial, the state, without having moved the Facebook video into evidence, asked the first victim if he recognized the defendant in the video he was shown. The defendant objected based on the best evidence rule. The trial court overruled the defendant's objection. The first victim testified that the defendant could be seen on the Facebook video driving the first victim's car and wearing the first victim's watch, while one of the codefendants was sitting in the front passenger seat counting the first victim's Cuban money.

After both the first victim and second victim testified, the Palm Beach County Sheriff's detective testified. The state, without having moved the Facebook video into evidence, asked the detective if he recognized anyone in the Facebook video. The defendant objected based on the best evidence rule. The trial court overruled the defendant's objection. The detective testified he recognized the defendant in the Facebook video. The detective

3

also testified that the Facebook video had been posted approximately twenty-one minutes after the second carjacking.

The state then moved to enter the Facebook video into evidence. The defendant objected, and the following exchange occurred at sidebar:

> THE COURT: I don't think it's been authenticated yet, has it?
>
> [DEFENSE COUNSEL]: That is our objection, Judge. We believe that this was extracted from the Jupiter Police Department, an agent from the Jupiter Police Department, and they have not yet testified. This witness [the Sheriff's detective] did not extract the video, just merely watched it.
>
> [STATE]: It was just pulled off Facebook. This is a copy of what was pulled off Facebook. This didn't come off anybody's cellphone.
>
> THE COURT: How are you going to authenticate it is the question.
>
> . . . .
>
> [STATE]: For one, it's self-authenticating. You have the Defendant himself saying that it's live, that he is doing it live. Number two, we know the cars were taken, the second car was taken after 1:30 in the morning, and we know the second car was found before 9:15 on the same day. So . . . we know it was taken between 1:30 and recovered between 9:15. This video is of both cars that were stolen --
>
> THE COURT: But how was it downloaded, how was it extracted? You still have an authentication –
>
> [STATE]: It's a copy of it off of Facebook.
>
> THE COURT: Did he [the Sheriff's detective] or did somebody else [download the video]?
>
> [STATE]: I don't think it matters who actually pulled it off. Anybody that viewed it can testify yes, that's the Facebook video I pulled off. And it authenticates itself that it occurred on that day and these are the individuals that are on the video.

4

THE COURT: I don't think you can authenticate it that way. I don't think you can just say I viewed the video and therefore it is authentic. Somebody needs to testify that they took the video off of Facebook . . . .

After the sidebar, the trial court sustained the defendant's objection to the introduction of the Facebook video based on lack of authentication.

Shortly thereafter, outside of the jury's presence, the state proffered testimony from a Jupiter police digital forensic examiner to authenticate the Facebook video. The digital forensic examiner testified that he had been performing that type of work for approximately six years. He had multiple certifications in computer forensics, and over six hundred hours of training in computer and cellphone forensics, which included a course in online social network investigations from websites like Facebook.

As part of the digital forensic examiner's investigation, he visited one codefendant's public Facebook page. He looked for videos posted within the carjackings' time frame. He found multiple videos on the codefendant's Facebook page, including a Facebook Live video showing people driving a car. He downloaded the video, and verified that the original and the downloaded videos were the same. He testified that at the time of trial, the video remained posted on the codefendant's Facebook page. He confirmed that the video which the state sought to introduce into evidence was the same video which he downloaded. He conceded that he was not sure whether the video's time stamp reflected the time it was recorded, or the time when it was posted on Facebook. He further testified that, aside from the video's time stamp indicating a time shortly after the second carjacking, he had no way of knowing when the video was created.

The defendant objected that a discovery violation occurred. The defendant argued that the digital forensic examiner was listed as a fact witness but should have been listed as an expert witness because he would be opining on the date and time that the video was created, and would be instructing the jury on how Facebook works, with which a layperson is not familiar. The defendant moved for a *Richardson* hearing.

The trial court found that the digital forensic examiner's testimony was not a discovery violation because "he is simply testifying as to [his] familiar[ity] with Facebook, what he did in downloading it and the features of Facebook."

The defendant then argued that the Facebook video was not authenticated because no witness present during the recording had testified, and no witness had testified as to the reliability of the process which produced the recording.

The state responded that the video was authenticated by its content's distinctive characteristics. According to the state, evidence that the defendant and the codefendants could be seen in the video driving the stolen cars and possessing the stolen property was sufficient to authenticate the video.

The trial court overruled the defendant's authentication objection. The court found that the state had made a prima facie showing of the video's genuineness. The court further reasoned that the video's content established its connection to the case, and the digital forensic examiner testified as to the manner in which the video was produced. The court recognized that its finding of genuineness was merely a threshold finding, and the parties still could argue to the jury about the weight and credibility to be given to the video.

The digital forensic examiner then testified before the jury consistent with his proffered testimony. During his testimony before the jury, the trial court admitted the Facebook video into evidence over the defendant's objections. The trial court also admitted into evidence, over the defendant's objections, a screenshot of the codefendant's Facebook page with the video post as it appeared on the day when the digital forensic examiner downloaded the video. The digital forensic examiner testified that the video's time stamp showed the video was posted at 1:51 a.m.

The state next recalled the Jupiter police detective to testify about the Facebook video's contents. At the beginning of the detective's testimony, the state played the Facebook video for the jury. The state then had the detective testify about his observations from the video based on his knowledge of the defendant's and codefendant's identities. The detective testified that the defendant was driving the first victim's car with one of the codefendants sitting in the passenger seat. The detective testified that the other two other codefendants were driving the second victim's car. The detective identified the defendant's voice as stating "we live" on the video.

After the state rested, the defendant moved for a judgment of acquittal. The defendant argued that the state's proof of grand theft of a vehicle was circumstantial because the first victim had not identified the defendant as one of the carjackers, and the only proof was that the defendant was in the first victim's vehicle on the Facebook video posted after the carjacking.

Additionally, the defendant argued that his mere possession of the first victim's car without any proof that he knew the car was stolen was insufficient to show guilty knowledge. The defendant also argued that his mere presence as an after-acquired passenger in the first victim's car was insufficient to prove him guilty of grand theft of that car. As to the charge for grand theft of the first victim's watch, the defendant argued that his mere possession of the watch was insufficient to show guilty knowledge.

The trial court denied the defendant's motion for judgment of acquittal, and found sufficient circumstantial evidence existed for the jury to find the defendant guilty of the charges.

The jury ultimately found the defendant guilty of grand theft of a vehicle and grand theft of the watch in the first carjacking, but acquitted him of charges arising from the second carjacking.

### *B. Our Review of the Defendant's Arguments*

This appeal followed. The defendant's arguments primarily relate to the evidence revealed by the Facebook video. According to the defendant, the trial court erred in four material respects:

1. ruling that the state had not committed a discovery violation by not identifying the Jupiter police digital forensic examiner as an expert and, as a result of that ruling, not holding a *Richardson* inquiry;

2. admitting the Facebook video into evidence over the defendant's objection that such evidence was not properly authenticated, because the Jupiter police digital forensic examiner and the Jupiter police detective did not record the video and were not shown in the recording of the video;

3. overruling the defendant's best evidence rule objections to allowing the first victim, the Sheriff's detective, and the Jupiter police detective to identify the defendant and the first victim's stolen property in the Facebook video when those witnesses were in the same position as the jury in reviewing the video; and

4. denying the defendant's motion for judgment of acquittal because the state did not prove the defendant intended to participate in the theft of the first victim's car and watch.

We address each argument in turn.

7

## 1. *The Discovery Objection*

"[W]here a trial court rules that no discovery violation occurred, the reviewing court must first determine whether the trial court abused its discretion." *Pender v. State*, 700 So. 2d 664, 667 (Fla. 1997).

Florida Rule of Criminal Procedure 3.220(b)(1)(A)(i) requires the state, as part of its discovery obligation, to disclose expert witnesses. Who constitutes an expert witness may be derived from section 90.702, Florida Statutes (2016):

> If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion or otherwise, if:
>
> (1) The testimony is based upon sufficient facts or data;
>
> (2) The testimony is the product of reliable principles and methods; and
>
> (3) The witness has applied the principles and methods reliably to the facts of the case.

Here, we agree with the trial court that the state had not committed a discovery violation by not identifying the Jupiter police digital forensic examiner as an expert. Although the digital forensic examiner testified based on his knowledge, skill, experience, training, and education, he did not testify in the form of an opinion. The digital forensic examiner testified in the form of facts – the actions which he took to access one of the codefendant's public Facebook page, find on that Facebook page the live video featuring the defendant and the codefendants, and download that video for use as evidence at trial.

The fact that the digital forensic examiner, while describing his actions, also explained for the jury how Facebook videos are broadcast and then saved to a Facebook profile timeline, did not convert his factual testimony into expert testimony. As the trial court found, the digital forensic examiner "simply testif[ied] as to [his] familiar[ity] with Facebook, what he did in downloading it and the features of Facebook." Like the trial court, we do not consider the digital forensic examiner's familiarity with Facebook to have been sufficiently specialized to fall within the scope of section 90.702. *See L.L. v. State*, 189 So. 3d 252, 256-57 (Fla. 3d DCA

8

2016) ("Of course, all lay witnesses have some specialized knowledge – knowledge relevant to the case that is not common to everyone. . . . Indeed, that is why all witnesses – lay or expert – are called: to get what they know about the case that other people do not.") (alteration, quotation marks, and citation omitted).

Based on the foregoing, we conclude that the trial court did not abuse its discretion in finding the state had not committed a discovery violation by not identifying the digital forensic examiner as an expert and, as a result of that ruling, not holding a *Richardson* inquiry.

## 2. *The Authentication Objection*

A trial court's conclusion regarding authentication is reviewed for an abuse of discretion. *Mullens v. State*, 197 So. 3d 16, 25 (Fla. 2016).

"Authentication or identification of evidence is required as a condition precedent to its admissibility. The requirements of this section are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." § 90.901, Fla. Stat. (2016).

The mere fact that an item appears online does not make it self-authenticating. Predicate testimony to establish its authenticity or to prove the truth of its content may be required. *See Dolan v. State*, 187 So. 3d 262, 266 (Fla. 2d DCA 2016) ("Any argument that a copy of an online document . . . can be admitted . . . without any predicate testimony to establish its authenticity or to prove the truth of its content . . . borders on the frivolous.").

However, "authentication for the purpose of admission is a relatively low threshold that only requires a prima facie showing that the proffered evidence is authentic; the ultimate determination of the authenticity of the evidence is a question for the fact-finder." *Mullens*, 197 So. 3d at 25. "Evidence may be authenticated by appearance, content, substance, internal patterns, or other distinctive characteristics taken in conjunction with the circumstances. In addition, the evidence may be authenticated either by using extrinsic evidence, or by showing that it meets the requirements for self-authentication." *Symonette v. State*, 100 So. 3d 180, 183 (Fla. 4th DCA 2012) (quotation marks and citation omitted).

Here, the state met the relatively low threshold required to authenticate the Facebook video. The digital forensic examiner visited one of the codefendants' public Facebook page. He looked for videos posted within the carjackings' time frame. He found a Facebook Live video showing the

stolen vehicles being driven by the defendant and the codefendants. He downloaded the video, verified that the original and the downloaded videos were the same, confirmed that the video which the state sought to introduce into evidence was the same video which he downloaded, and testified that the video remained posted on the codefendant's Facebook page at the time of trial. The first victim testified that the defendant could be seen on the Facebook video driving the first victim's car while wearing the first victim's watch while a codefendant counted the first victim's Cuban money. The Jupiter police detective also testified that the defendant could be seen on the Facebook video driving the first victim's car while stating "we live" on the video. Based on this evidence, we conclude the state made a prima facie showing of the video's authenticity for the purpose of admission into evidence, thus allowing the jury to make the ultimate determination of the weight to be given to the video's contents.

The defendant cites *Santana v. State*, 191 So. 3d 946 (Fla. 4th DCA 2016), for the proposition that "authentication should be made by the technician who operated the recording device or a person with knowledge of the conversation that was recorded." *Id.* at 948. However, *Santana* is distinguishable from the instant case. In *Santana*, the state entered into evidence an alleged *audio* recording of phone conversations between the defendant and a confidential informant. *Id.* at 947. At trial, the confidential informant did not testify, and the investigating agent could not testify that the recordings were true representations of the conversations because he did not monitor the conversations. *Id.* at 948. We found that although the state had introduced testimony supporting the speakers' identities on the recording, the state did not introduce evidence showing that the recording accurately represented the conversations. *Id.*

*Santana* is distinguishable because there, the issue was an audio recording which potentially could have been altered without detection. Here, however, the Facebook video provides an unbroken visual recording of the defendant for an extended period of time.

The defendant's argument that we should require the state to provide testimony from the defendant, codefendants, or other witnesses who appear in the video, or from someone who recorded the video, sets the authentication burden too high. *See U.S. v. Broomfield*, 591 Fed. Appx 847, 852 (11th Cir. 2014) (*Biggins* factors usually applied to admitting government surveillance, such as how recording occurred, the recording equipment's condition, and how relevant speakers were identified, were unnecessary to authenticate a YouTube video, because "the prosecution could seldom, if ever, authenticate a video that it did not create."). Instead, as in *Broomfield*, if the video's distinctive characteristics and content, in

conjunction with circumstantial evidence, are sufficient to authenticate the video, then the government has met its authentication burden.  *Id.*

We choose to follow the Eleventh Circuit and other courts which have permitted the admission of social media videos in criminal cases based on sufficient evidence that the video depicts what the government claims, even though the government did not:  (1) call the creator of the videos; (2) search the device which was used to create the videos; or (3) obtain information directly from the social media website.  *See, e.g., U.S. v. Washington*, 2017 WL 3642112 *2 (N.D. Ill. Aug. 24, 2017) (YouTube video which the government contended showed the defendant and several other men pointing firearms at the camera was sufficiently authenticated where law enforcement witness would testify that he watched this video on YouTube, recognized the defendant, and downloaded the video);  *State v. Gray*, 2017 WL 3426021 *16 (La. Ct. App. June 28, 2017) (YouTube videos were sufficiently authenticated where the investigating officer's testimony provided sufficient support that the videos were what the state claimed them to be, that is, videos depicting the defendant and other gang members in a park and surrounding area).  As the *Washington* court stated, "[w]hile a witness with [knowledge of the video's creation] *could* authenticate [the] video, Rule 901 does not *require* it."  2017 WL 3642112 at *2.[1]

Here, as in the foregoing cases, the state met its authentication burden. The state presented the Jupiter Police digital forensic examiner's testimony regarding how the Facebook video was obtained and its distinctive characteristics, and the first victim's and the Jupiter police detective's testimony regarding the Facebook video's distinctive content.  Therefore, the trial court did not abuse its discretion in admitting the Facebook video into evidence over the defendant's objection that such evidence was not properly authenticated.

---

[1] *But see, e.g., U.S. v. Hassan*, 742 F.3d 104 (4th Cir. 2014) (trial court did not abuse its discretion in admissions of Facebook pages and YouTube videos where the government presented the certifications of records custodians of Facebook and Google, verifying that the Facebook pages and YouTube videos had been maintained as business records in the course of regularly conducted business activities, and by tracking the Facebook pages and Facebook accounts to the defendant's mailing and e-mail addresses via internet protocol addresses); *People v. Franzese*, 61 N.Y.S.3d 661 (N.Y. Sup. Ct. App. Div. 2d 2017) (YouTube video was properly authenticated by a YouTube certification, which indicated when the video was posted online, by a police officer who viewed the video at or about the time that it was posted online, by the defendant's own admissions about the video made in a jail phone call, and by the video's distinctive characteristics).

### 3. *The Best Evidence Objection*

 "A trial court's decision on the admissibility of evidence is reviewed under an abuse of discretion standard.  That discretion, however, is limited by the rules of evidence." *Ayalavillamizar v. State*, 134 So. 3d 492, 496 (Fla. 4th DCA 2014) (citation omitted).

The best evidence rule is codified in section 90.952, Florida Statutes (2016):  "Except as otherwise provided by statute, an original writing, recording, or photograph is required in order to prove the contents of the writing, recording, or photograph."  "This rule is predicated on the principle that if the original evidence is available, that evidence should be presented to ensure accurate transmittal of the critical facts contained within it."  *T.D.W. v. State*, 137 So. 3d 574, 576 (Fla. 4th DCA 2014) (citation omitted).

Here, the original evidence was available and presented.  Thus, the best evidence rule was satisfied.

What the defendant appears to be arguing, instead of the best evidence rule, is an unpreserved "lay opinion" objection that the first victim, the Sheriff's detective, and the Jupiter police detective were permitted to identify the defendant and the first victim's stolen property in the Facebook video when those witnesses were in the same position as the jury in reviewing the video.  Even though this apparent "lay opinion" objection was not specified as such, we will address it on the merits.

Section 90.701, Florida Statutes (2016), states:

> If a witness is not testifying as an expert, the witness's testimony about what he or she perceived may be in the form of inference and opinion when:

> (1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and

> (2) The opinions and inferences do not require a special knowledge, skill, experience, or training.

We recently examined section 90.701 to determine the circumstances when a court may allow a lay person to identify persons in recordings. As we stated in *Alvarez v. State*, 147 So. 3d 537 (Fla. 4th DCA 2014):

> Even non-eyewitnesses may testify as to the identification of persons depicted or heard on a recording so long as it is clear the witness is in a better position than the jurors to make those determinations. *See Johnson v. State*, 93 So. 3d 1066, 1069 (Fla. 4th DCA 2012) (holding no error in admission of detective's identification of defendant as individual in surveillance video where defendant changed his appearance after the event recorded in the video, and the detective had a personal encounter with the defendant shortly after the event and before he changed his appearance); *State v. Cordia*, 564 So. 2d 601, 601-02 (Fla. 2d DCA 1990) (finding that officers' identification of defendant's voice on a recording was admissible where officers had worked with defendant in the past and were familiar with his voice).

> However, "[w]hen factual determinations are within the realm of an ordinary juror's knowledge and experience, such determinations and the conclusions to be drawn therefrom must be made by the jury." *Ruffin v. State,* 549 So. 2d 250, 251 (Fla. 5th DCA 1989) (finding the court erred in allowing three officers to identify defendant as the man in the videotape, where the officers were not eyewitnesses to the crime, did not have familiarity with Ruffin, and were not qualified as experts in identification); *see also Proctor v. State,* 97 So. 3d 313, 315 (Fla. 5th DCA 2012) (finding court erred in allowing officer to identify defendant as the perpetrator in a surveillance video where the officer was in no better position than the jury to make that determination); *Charles v. State,* 79 So. 3d 233, 235 (Fla. 4th DCA 2012) (finding court erred in allowing detective to testify that he could not identify the defendant as the person on the surveillance video the first time he watched it, but "he was later able to piece things together and identify the person in the video" as the defendant).

*Alvarez,* 147 So. 3d at 542-43.

Here, the two investigating detectives were in a better position than the jury to identify the defendant and codefendants in the Facebook video, because the detectives were familiar with the defendant and codefendants

through their investigation and interviews, and because the codefendants were not jointly tried with the defendant and did not testify before the jury.

Additionally, the first victim was in a better position than the jury to identify his stolen car, stolen watch, and stolen Cuban money in the Facebook video because he was familiar with those items. Although the first victim identified the defendant in the Facebook video in the context of identifying the stolen property, we consider the first victim's identification of the defendant to be harmless given that the two investigating detectives identified the defendant in the Facebook video, and the state played the Facebook video for the jury.

In sum, because the two investigating detectives and the first victim were in a better position than the jury to identify the persons and stolen property in the Facebook video, the trial court did not abuse its discretion in overruling the defendant's best evidence/lay opinion objection to the investigating detectives and the first victim describing the Facebook video's contents.

### 4. *The Motion for Judgment of Acquittal*

The standard of review for denial of a motion for judgment of acquittal was stated in *Pagan v. State*, 830 So. 2d 792 (Fla. 2002):

> In reviewing a motion for judgment of acquittal, a de novo standard of review applies. Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence. If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction. However, if the State's evidence is wholly circumstantial, not only must there be sufficient evidence establishing each element of the offense, but the evidence must also exclude the defendant's reasonable hypothesis of innocence.

*Id.* at 803 (internal citations omitted). Nevertheless, "[t]he State is not required to rebut a hypothesis of innocence that is unreasonable." *Westbrooks v. State*, 145 So. 3d 874, 878 (Fla. 2d DCA 2014).

In the instant case, the defendant's hypothesis of innocence was that he was not present when the carjackings occurred and was not involved in the carjackings. Rather, he argued, he made a poor decision by being in the first victim's car and hanging out with the codefendants after the

14

carjackings occurred. Thus, the defendant argued, he lacked the intent to participate in the crimes.

The state's evidence rebutted the defendant's hypothesis of innocence. The defendant appeared in the Facebook video just a few hours after the first carjacking, and less than an hour after the second carjacking, driving the first victim's car, wearing the first victim's watch, and stating "we live" when the video was recording, while a codefendant counted the first victim's Cuban money. Both victims identified from the crime scenes two codefendants who appeared in the video with the defendant. Viewing this evidence in the light most favorable to the state, a rational trier of fact could find beyond a reasonable doubt that the defendant was part of the scheme to steal the first victim's property, and not merely in the wrong place at the wrong time with the wrong crowd after the fact. *See* § 812.022(2), Fla. Stat. (2016) ("[P]roof of possession of property recently stolen, unless satisfactorily explained, gives rise to an inference that the person in possession of the property knew or should have known that the property had been stolen."); *T.S.R. v. State*, 596 So. 2d 766, 767 (Fla. 5th DCA 1992) ("Although there is no direct physical evidence linking the defendant to the crimes[,] the finder of fact has the right to infer guilt of theft from the unexplained possession of recently stolen goods.").

To the extent the defendant's intent was in question, the evidence presented was sufficient to send that question to the jury. *See Salter v. State*, 77 So. 3d 760, 763 (Fla. 4th DCA 2011) (the "intent to participate in a crime is a question for the jury and a trial court properly denies a motion for judgment of acquittal where an issue remains for the jury to decide.").

Based on the foregoing, the trial court did not err in denying the defendant's motion for judgment of acquittal.

### *Conclusion*

But for the defendant's participation in the Facebook video showing off the bounty from that night's criminal escapade, the state may not have had sufficient evidence to convict the defendant as a participant in these crimes. However, the Facebook video existed, and made the state's case. The trial court: (1) properly ruled that the state had not committed a discovery violation in its disclosure of the digital forensic examiner who obtained the Facebook video; (2) properly overruled the defendant's authentication objection to the Facebook video's admission based on the state's witnesses' testimony; (3) properly overruled the defendant's best evidence/lay opinion objection to allowing the state's witnesses to identify the defendant and the first victim's stolen property in the Facebook video;

and (4) properly denied the defendant's motion for judgment of acquittal. We find no merit in the defendant's other arguments not discussed in this opinion.  We affirm the defendant's convictions.

*Affirmed.*

GROSS and KUNTZ, JJ., concur.

*    *    *

**Not final until disposition of timely filed motion for rehearing.**