# Third District Court of Appeal

## State of Florida

Opinion filed June 11, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D23-1853
Lower Tribunal No. F20-17380 A
_____

**Aldrin Gomez-Martinez,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, William Altfield, Judge.

Richard F. Della Fera, P.A., and Richard F. Della Fera (Fort Lauderdale), for appellant.

James Uthmeier, Attorney General, and Katryna Santa Cruz, Assistant Attorney General, for appellee.

Before LOGUE, C.J., and LOBREE and GOODEN, JJ.

LOGUE, C.J.

Aldrin A. Gomez-Martinez appeals from his convictions and sentences for trafficking in cocaine and conspiracy to traffic in cocaine. Among other things, he challenges the admission into evidence of recorded calls between a confidential informant and a co-defendant and co-conspirator, Melphys Santana-Ozuna, where these conversations were not heard live by anyone else. Neither the confidential informant nor the co-conspirator testified at trial. Accordingly, there was no testimony by a witness to the recordings that they accurately reflected the conversations. Gomez-Martinez's appeal raises the question of whether audio recordings can be authenticated by direct and circumstantial evidence other than by the direct testimony of a witness who participated in the calls or otherwise heard the conversations live. We answer the question in the affirmative.

## BACKGROUND

Based on an undercover reverse sting operation conducted on December 15, 2020, the State charged three individuals—Gomez-Martinez, Melphys A. Santana-Ozuna, and Christian Jaquez, with trafficking in cocaine, conspiracy to traffic in cocaine, and money laundering. Jaquez entered into a plea agreement, and Gomez-Martinez and co-defendant Santana-Ozuna were tried together. As discussed below, the jury found, among other things, that they were co-conspirators.

2

At trial, the State relied primarily upon the testimony of Hialeah Police Detective Jirani Mirabel, who oversaw the operation, and Detective Daniel Gato, who served as the undercover seller of the cocaine. At this stage of the proceedings, we must view the evidence "in the light most favorable to the State." Johnston v. State, 863 So. 2d 271, 283 (Fla. 2003). In this light, the evidence introduced at trial reflects the following.

A confidential informant, who was paid by the Hialeah Police Department, advised Detective Mirabel that an individual was seeking to buy five kilograms of cocaine. Detective Mirabel directed the Informant to proceed with setting up the sale and to record telephone conversations between himself and the target. This target turned out to be Santana-Ozuna. The Informant told Detective Mirabel that Santana-Ozuna would only speak through an encrypted application. Because of the difficulty of recording conversations over the encrypted application, the police gave the Informant a device that allowed the conversations to be recorded. The device was tested for accuracy on the day prior to the first recorded conversation.

Using the device, the Informant recorded calls between himself and Santana-Ozuna setting up the drug transaction. The calls were in Spanish. For five of those calls, the recordings and translated transcriptions were entered into evidence. For each call, the Informant would state the date and

3

time of the call on the recording before placing the call with co-defendant Santana-Ozuna. The five calls occurred as follows: December 3, 2020 at 11:35 a.m.; December 4, 2020 at 11:49; December 13, 2020 at 8:38 p.m.; December 14, 2020 at 8:38 p.m.; and December 15, 2020 at 12:50 p.m. The transcripts of the translations of the calls include the duration. Detective Mirabel testified that the Informant would call him before making a call, and the Informant sent him the recording of the conversations "immediately after the phone call completes."

At trial, when the State attempted to enter into evidence recordings that Detective Mirabel did not listen to live, both Gomez-Martinez and co-defendant Santana-Ozuna objected, arguing there was no testimony at trial by a witness with direct knowledge that the recordings accurately reflect the conversations they purport to depict. The defense clarified that it was not "talking about identity in this case. We're talking about the proper foundation for the recordings." Over objection, the trial court admitted the recordings.

The recordings show the Informant and Santana-Ozuna agreeing to the details of the drug buy. Among other things, the recordings reflect that Santana-Ozuna stated that the buyers would drive from New York to Massachusetts to pick up money and then drive to Miami. The agreement reached was for the purchase of five kilograms of cocaine at $32,000 per

4

kilogram, three for cash and two on credit.

Prior to the transaction, Detective Mirabel brought Detective Gato into the investigation. Detective Gato was assigned to act as the undercover seller of the cocaine. The Informant instructed Santana-Ozuna to go to an IHOP parking lot in Hialeah on December 15, 2020. On the day of the transaction, the Informant, who was wearing a wire, and Detective Gato drove in an undercover police vehicle to the IHOP parking lot. Already stationed at the location were Detective Mirabel and other officers from the department serving as undercover observers. The three defendants arrived together in one vehicle at the arranged time. They initially parked in a parking lot across from the arranged meeting point – the IHOP parking lot. Detective Mirabel testified Gomez-Martinez conducted counter-surveillance by examining the other vehicles in the area. The Informant then called Santana-Ozuna and told him to meet at the IHOP parking lot. Detective Mirabel, listening in over the wire worn by the Informant, saw Santana-Ozuna answer his phone and heard his voice.

The three defendants then walked over to the IHOP parking lot. Detective Gato and the Informant engaged the defendants in a conversation. Gomez-Martinez then drove the defendants' vehicle to the IHOP parking lot. Detective Gato asked for proof the defendants had brought the money to

5

purchase the cocaine, and Santana-Ozuna showed Detective Gato money in the back seat of the vehicle. Gomez-Martinez was present and sufficiently close to hear the conversation and see the presentation of the money to Detective Gato. Photographs of this meeting were introduced into evidence.

Detective Gato disclosed to the defendants the address of the warehouse where the transaction would take place. At the warehouse, the group entered a small office. Cameras in the office captured the transaction on video with an audio component. Present were Detective Gato, the Informant, and the three defendants.

The video of the transaction was shown at trial. The video was paused several times to allow Detective Gato to explain what occurred. The video shows Detective Gato placing on top of the desk four vacuumed-sealed packages wrapped in black tape, a package wrapped in black tape that was unsealed that contained approximately half a kilogram of cocaine, and a clear sealed package with a white substance.

When Jaquez began to inspect the cocaine in the opened package, Santana-Ozuna gave Detective Gato one bundle of money. While the cocaine was being inspected, Gomez-Martinez picked up one of the sealed packages, looked at it, and then put it back on the desk. During the inspection, Jaquez complained that the cocaine was damp. Detective Gato

6

explained that he opened the package to allow the cocaine to be inspected but they would receive the sealed kilograms of cocaine that were on the desk.

While Jaquez was inspecting the cocaine, Detective Gato asked Santana-Ozuna for the rest of the money. Santana-Ozuna pulled out another bundle of money from his waistband and gave it to Detective Gato. Gomez-Martinez pulled money out of his fanny pack and held the money while listening to a discussion about the quality of the cocaine. Detective Gato then gave the takedown signal and the defendants were arrested. Following the defendants' arrests, it was determined Santana-Ozuna gave Detective Gato $40,000, Gomez-Martinez had $14,000 in his possession, and Jaquez had no money on him.

Following Detective Gato's testimony, Santana-Ozuna provided a voice exemplar to the jury. The trial court instructed the jury that the exemplar was for them to consider as it relates to the phone calls.

The State rested. Gomez-Martinez and co-defendant Santana-Ozuna moved for judgments of acquittal, which were denied. They did not testify. The defense rested and renewed prior objections and their motions for judgments of acquittal.

The jury was provided separate verdict forms for Gomez-Martinez and

co-defendant Santana-Ozuna. As to Gomez-Martinez, the jury found him guilty of trafficking in cocaine and conspiracy to traffic in cocaine, but not guilty of money laundering. Gomez-Martinez filed a motion for new trial, which the trial court denied. The trial court sentenced Gomez-Martinez. His appeal followed.

## ANALYSIS

Gomez-Martinez argues the trial court erred in admitting into evidence the recorded phone calls between the Informant and co-defendant Santana-Ozuna. In making this argument, Gomez-Martinez relies upon the fact that neither testified at trial. Gomez-Martinez asks this Court to hold that an audio recording can only be admitted into evidence in a Florida courtroom if it is authenticated by a witness who participated in the recorded phone call or otherwise heard the conversation live and testifies that the recording accurately reflects the conversation. We respectfully but firmly decline to adopt such a holding.

Section 90.901, Florida Statutes (2023), provides that "[a]uthentication or identification of evidence is required as a condition precedent to its admissibility. The requirements of this section are satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." "[A]uthentication for the purpose of admission is a relatively low

8

threshold that only requires a prima facie showing that the proffered evidence is authentic; the ultimate determination of the authenticity of the evidence is a question for the fact-finder." <u>Mullens v. State</u>, 197 So. 3d 16, 25 (Fla. 2016).

Prima facie "means no more than, evidence sufficient to justify, but not to compel, an inference . . . if the jury so find." <u>Crowe v. Overland Hauling, Inc.</u>, 245 So. 2d 654, 657 (Fla. 4th DCA 1971). "'Prima facie' is defined as '[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted; based on what seems to be true on first examination, even though it may be later proved to be untrue.'" <u>Jefferson v. State</u>, 264 So. 3d 1019, 1027 (Fla. 2d DCA 2018) (quoting <u>Prima Facie</u>, <u>Black's Law Dictionary</u> (10th ed. 2014)). Prima facie also means "[a]t first sight; before closer inspection[.]" <u>Jefferson</u>, 264 So. 3d at 1027 (quoting <u>The American Heritage Dictionary</u> (5th ed. 2011)). "The phrase 'tending to prove' appears to have been considered as being synonymous with 'prima facie.'" <u>State v. Snowden</u>, 345 So. 2d 856, 857 n.2 (Fla. 1st DCA 1977).

In sum, because nothing more is required than "a prima facie showing," the Florida Supreme Court has indicated "that authentication for the purpose of admission is a relatively low threshold[.]" <u>Mullens</u>, 197 So. 3d at 25. Conclusive proof of authenticity is not required.

Direct testimony is not the only type of evidence that serves to provide

9

a prima facie showing of authenticity: "Circumstantial evidence, either alone or in conjunction with direct evidence, is admissible for Rule 901 authentication purposes." United States v. Hernandez-Garcia, 215 F.3d 1312, *2 (1st Cir. 2000) (unpublished table decision) (citing United States v. Carrasco, 887 F.2d 794, 804 (7th Cir. 1989)).[1] "Evidence may be authenticated by appearance, content, substance, internal patterns, or other distinctive characteristics taken in conjunction with the circumstances." Lamb v. State, 246 So. 3d 400, 408 (Fla. 4th DCA 2018) (quoting Symonette v. State, 100 So. 3d 180, 183 (Fla. 4th DCA 2012)).

The principle that evidence can be authenticated by circumstantial evidence applies across the board to all types of evidence, including audio recordings. Courts often characterize the evidence required to authenticate an audio recording as having four elements: "(1) the recording device was operating properly, (2) the device was operated in a proper manner, (3) the recording was accurate, and (4) the voices of the persons speaking were

---

[1] Because the Florida Evidence Code is modeled after the Federal Rules of Evidence—and specifically because Section 90.901 of the Florida Evidence Code is modeled after Federal Rule of Evidence 901—it is proper for this Court to consider federal courts' interpretations of Rule 901 when interpreting Section 90.901. See L.L. v. State, 189 So. 3d 252, 255 (Fla. 3d DCA 2016) ("Where, as here, a Florida evidentiary rule is patterned after its federal counterpart, 'federal cases interpreting comparable provisions are persuasive and routinely looked to for interpretive guidance.'" (quoting Bank of N.Y. v. Calloway, 157 So. 3d 1064, 1071 n.3 (Fla. 4th DCA 2015))).

identified." <u>Vilsaint v. State</u>, 127 So. 3d 647, 650 (Fla. 4th DCA 2013) (quoting <u>Jackson v. State</u>, 979 So. 2d 1153, 1155 (Fla. 5th DCA 2008)). "With regards to the admission of audio recordings," however, "'there [is] no specific list of requirements' to determine compliance with section 90.901." <u>Santana v. State</u>, 191 So. 3d 946, 948 (Fla. 4th DCA 2016) (quoting <u>Justus v. State</u>, 438 So. 2d 358, 365 (Fla.1983)).

Direct testimony of a person who heard the conversation live may be the most common way to establish the authenticity of an audio recording; it may be the most reliable way; it is not the only way. Courts that have considered the issue of whether circumstantial evidence can be used to authenticate an audio recording have concluded it can. As stated earlier, "[c]ircumstantial evidence, either alone or in conjunction with direct evidence, is admissible for Rule 901 authentication purposes." <u>Hernandez-Garcia</u>, 215 F.3d 1312, at *2 (upholding admission of recorded telephone call without testimony of person who heard the conversation live). "In-court testimony by a particular witness is not a prerequisite to authenticate non-testimonial evidence." <u>United States v. Hemmings</u>, 482 F. App'x 640, 643 (2d Cir. 2012) (unpublished disposition) (upholding the admission of recordings of telephone calls in prosecution for distribution of cocaine based upon the identification of the voices on the call without testimony of person who heard

11

the conversations live).

"There simply is no requirement that the tapes be put in evidence through the person wearing the recorder or, for that matter, through a contemporaneous witness to the recorded conversations." United States v. Fuentes, 563 F.2d 527, 532 (2d Cir. 1977) (upholding the admission of taped conversations between non-testifying defendant and non-testifying confidential informant where circumstantial evidence surrounding the taping provided a sufficient prima facie showing of authenticity, including placing a wire on the informant and the immediate removal of the tapes from the informant; holding that arguments that the informant had an opportunity to tamper with the tapes "go only to the weight to be given to the tapes, not to their admissibility"). See United States v. Emerson, 501 F.3d 804, 814–15 (7th Cir. 2007) (upholding the admission of audio tapes without testimony of person who heard conversations live based upon the supervising detective's testimony establishing the location of the recording device, that informant wearing the wire did not know how to turn the recording device on or off, and that the voices on the tape were those of the informant and the defendants).

Finally, the circumstantial evidence sufficient to make a prima facie showing of authenticity may include the content of the audio recording itself. In particular, "authentication may be established by circumstantial evidence

such as the similarity between what was discussed by the speakers and what each subsequently did." United States v. Puerta Restrepo, 814 F.2d 1236, 1239-41 (7th Cir. 1987) (upholding the admission of audio recording of telephone call even in absence of direct testimony that voice on call was that of the defendant as defendant's subsequent actions corroborated he was the party in the conversation).

The consistency of the defendant's actions with the discussion on the recorded audio call has repeatedly been relied upon to make a prima facie showing of authenticity. See United States v. Hassell, 547 F.2d 1048, 1055 (8th Cir. 1977) (admitting audio recording of telephone call without testimony of person who heard the entire conversation live, in part, because "the similarity between what was arranged on the telephone and what subsequently occurred, with [the defendant] participating, was sufficient circumstantial evidence . . . to provide a foundation for admission of the tape into evidence"); United States v. Bonanno, 487 F.2d 654, 659 (2d Cir. 1973) (admitting recording of telephone call in prosecution for counterfeiting currency because "the substance of the communication may itself be enough to make prima facie proof," and holding the argument that the testifying detective "was incompetent solely because he was not a contemporaneous witness to the phone conversation is without merit"); United States v. Green,

324 F.3d 375, 380 (5th Cir. 2003) (admitting audio recordings of telephone calls, in part, because the testifying detective "corroborated [the defendant's] conversations with his actions on numerous occasions"). See generally Lamb, 246 So. 3d at 409 (holding that, in the absence of direct testimony, a "video's distinctive characteristics and content, in conjunction with circumstantial evidence, are sufficient to authenticate the video [at issue]").

Turning from this review of the law to the case before us, we conclude that the facts presented at trial constitute a sufficient prima facie showing of the authenticity of the audio recordings. In this regard, we give particular significance to the following:

- Direct evidence established the identities of the speakers and, in fact, the identities of the speakers are not being challenged. The direct evidence was (1) testimony of Detective Mirabel who recognized both voices and (2) the voice exemplar Santana-Ozuna provided to the jury to allow the members of the jury to independently confirm the identity of his voice on the recording.

- The evidence reflects there existed no time lag between the recording of the calls and the delivery of the recordings to the detective. Detective Mirabel testified that the Informant would call him before placing the call, the copies of the recordings were sent to him "immediately" after the telephone calls were completed, and the recordings themselves contain the date and time of the calls and reflect the duration.

- Significantly, Gomez-Martinez, Santana-Ozuna, and the other defendant appeared at the designated date, time, and parking lot; brought an unusually large amount of cash; displayed the money to the undercover officers they had never previously met;

14

traveled to the warehouse when told of its location after displaying the money; inspected the cocaine; and proceeded with the drug transaction as arranged in the audio recordings.

- The circumstances surrounding the making and recording of the telephone calls were explained in detail and make coherent, logical sense.

While each of these circumstances taken in isolation may not suffice, together they provide a sufficient prima facie showing of the authenticity of the audio recordings. In fact, these facts provide a textbook example of where "the similarity between what was arranged on the telephone and what subsequently occurred, with [the defendant] participating, was sufficient circumstantial evidence . . . to provide a foundation for admission of the tape into evidence." Hassell, 547 F.2d at 1055. In these circumstances, particularly where the evidence reflects no time lag between the recording of the calls and the delivery to the detective, Gomez-Martinez's arguments that the informant may have had an opportunity to tamper with the tapes "go only to the weight to be given to the tapes, not to their admissibility." Fuentes, 563 F.2d at 532.

Gomez-Martinez's reliance on Santana is unavailing. In Santana, the Fourth District ruled that the trial court erred in admitting an audio recording because it was not authenticated. In the course of doing so, the Fourth District at one point stated, "[T]he authentication should be made by the

technician who operated the recording device or a person with knowledge of the conversation that was recorded." Santana, 191 So. 3d at 948. We do not read Santana as holding that these are the only methods for authenticating audio recordings because in the prior sentence, the court clearly noted there are multiple ways to authenticate audio recordings, stating: "With regards to the admission of audio recordings, 'there [is] no specific list of requirements' to determine compliance with section 90.901." Id. (quoting Justus, 438 So. 2d at 365). We also distinguish Santana because it did not address the existence of the direct and circumstantial evidence authenticating the audio recordings as is present in this case and therefore the court had no need to address the numerous cases cited above holding circumstantial evidence can be used to authenticate audio recordings.

No one doubts that circumstantial evidence may be used to authenticate evidence, including video recordings. See generally Lamb, 246 So. 3d at 409 (holding that, in the absence of direct testimony, a "video's distinctive characteristics and content, in conjunction with circumstantial evidence, are sufficient to authenticate the video [at issue]"). The defendant, in essence, asks us to carve out a special exception and hold that audio recordings are the only type of evidence that cannot be authenticated by circumstantial evidence.

This is painting with too broad a brush. We see no basis for this exception in the language adopted by the Legislature in requiring authentication. See § 90.901, Fla. Stat. (2023). Underlying Gomez-Martinez's argument appears to lie the unstated premise that direct testimony is intrinsically more reliable than circumstantial evidence. But the reliability of evidence is too dependent on context to support such a generalization. In terms of reliability, the Florida Supreme Court has recognized, "[c]ircumstantial evidence . . . is intrinsically no different from testimonial evidence." Bush v. State, 295 So. 3d 179, 199 (Fla. 2020) (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). "Admittedly," the Court explained, "circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence." Id. Similarly, Justice Clarence Thomas explained: "The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) (quoting Rogers v. Missouri Pac. R.R. Co., 352 U.S. 500, 508, n.17 (1957)).

In the final analysis, we decline to adopt Gomez-Martinez's exception for audio recordings for the same reason the Fourth District declined to

17

accept it for video recordings: "The defendant's argument that we should require the state to provide testimony from the defendant, codefendants, or other witnesses who appear in the video, or from someone who recorded the video, sets the authentication burden too high." Lamb, 246 So. 3d at 409. Instead, "if the video's distinctive characteristics and content, in conjunction with circumstantial evidence, are sufficient to authenticate the video, then the government has met its authentication burden." Id. See also U.S. v. Broomfield, 591 Fed. App'x 847, 852 (11th Cir. 2014) (rejecting such high requirement because "the prosecution could seldom, if ever, authenticate a video that it did not create").

We have carefully considered the other arguments raised by Gomez-Martinez and find they do not warrant a reversal.

## CONCLUSION

Direct testimony of the authenticity of an audio recording by the testimony of a person who heard the conversation live is certainly the most common method to authenticate an audio recording. But it is not the only method. Even in the absence of the direct testimony of a person who overheard the conversation live, a prima facie showing of the authenticity of an audio recording sufficient to enter it into evidence can be established by other direct testimony and circumstantial evidence. Here, the State's

18

evidence sufficiently provided the prima facie showing that met the "relatively low threshold" to support the admissibility of the recordings, with "the ultimate determination of the authenticity of the evidence" remaining "a question for the fact-finder." <u>Mullens</u>, 197 So. 3d at 25.

Affirmed.

LOBREE, J., concurs.

GOODEN, J., dissenting.

I must respectfully dissent. While the threshold for authentication is low, I do not believe that hurdle was crossed under these facts.

Section 90.901, Florida Statutes, states that authentication is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." § 90.901, Fla. Stat. (2023). While this section "does not enumerate the methods of authenticating evidence," "they are fairly well defined by judicial decision." Charles W. Ehrhardt, et al., 1 Fla. Prac., Evidence § 901.1 (2024 ed.). Our Court has required the State to show: "(1) the recording device was operating properly, (2) that it was operated in a proper manner, (3) the recording was accurate, and (4) the voices of the persons speaking were identified." Parnell v. State, 218 So. 2d 535, 541 (Fla. 3d DCA 1969). See also Gomien v. State, 172 So. 2d 511, 515 (Fla. 3d DCA 1965); Montano v. State, 846 So. 2d 677, 681 n.1 (Fla. 4th DCA 2003); Hernandez v. State, 919 So. 2d 707, 710 (Fla. 5th DCA 2006); Jackson v. State, 979 So. 2d 1153, 1155 (Fla. 5th DCA 2008); Vilsaint v. State, 127 So. 3d 647, 650 (Fla. 4th DCA 2013). Accord U.S. v. Lively, 803 F.2d 1124, 1129 (11th Cir. 1986) ("As a general matter, the prosecutor must establish (1) that the operator of the recording equipment was competent,

20

(2) that the equipment functioned accurately, (3) that the tape has not been materially altered, and (4) the identity of the speakers."); U.S. v. Sarro, 742 F.2d 1286, 1292 (11th Cir. 1984) ("In order to authenticate a taped recording, the government, in a criminal case, must show: (1) the competency of the operator; (2) the fidelity of the recording equipment; (3) the absence of material deletions, additions, or alterations in the relevant part of the tape; and (4) the identification of the relevant speakers.").

Generally, "the authentication should be made by the technician who operated the recording device or a person with knowledge of the conversation that was recorded." Santana v. State, 191 So. 3d 946, 948 (Fla. 4th DCA 2016). Accord Ehrhardt, et al., 1 Fla. Prac., Evidence § 401.4 ("This authentication may be supplied by the technician who operated the device or by any other person with knowledge."); 2 McCormick On Evid. § 216 (9th ed.) ("As with video or film recordings of real events, if a percipient witness overheard the voices *as they were recorded*, this witness may provide the required authentication foundation by testifying that the sound recording is an accurate record of what the witness did hear.") (emphasis added); McCoy v. State, 853 So. 2d 396, 403 (Fla. 2003) (finding recording was authenticated by testimony of participant of conversation); T.M. v. State, 271 So. 3d 1171, 1172 (Fla. 3d DCA 2019) ("The audio can be authenticated

and admitted if the party speaking on the recording testifies that the audio is an accurate representation of the conversation.").

The State did not produce the quantum of evidence necessary to authenticate the audio recordings. Neither the confidential informant, a participant in the conversation, nor someone who listened as the recordings occurred, testified at trial. Testimony from the detective was not sufficient— as it did not establish that the recording device was operating properly, the recorder operated in a proper manner, and the recordings were accurate. Parnell, 218 So. 2d at 541; Gomien, 172 So. 2d at 515.

To support its conclusion, the majority relies exclusively on circumstantial evidence.[2] While I do not dispute that circumstantial evidence

---

[2] The majority also heavily relies on federal decisions. But federal circuit courts are not uniform as to the required showing. Several federal circuits require clear and convincing evidence to establish authenticity for admission of audio recordings in criminal cases. See United States v. Knohl, 379 F.2d 427, 440 (2d Cir. 1967) ("We are not unmindful, however, that tape recordings are susceptible to alteration and that they often have a persuasive, sometimes a dramatic, impact on a jury. It is therefore incumbent on the Government to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings; and where the court accepts them as authentic and accurate but the evidence is conflicting on these points, it must caution the jury to scrutinize the evidence with care."); United States v. Starks, 515 F.2d 112, 121 (3d Cir. 1975); United States v. Welch, 945 F.2d 1378, 1383 (7th Cir. 1991); United States v. King, 587 F.2d 956, 961 (9th Cir. 1978). At least one requires "substantial" evidence. See United States v. Smith, 481 F.3d 259, 265 (5th Cir. 2007). Others require something else. See United States v. McMillan, 508 F.2d 101, 104 (8th Cir. 1974) (requiring proponent to show "(1) That the recording

22

can generally be used to authenticate evidence, see Ehrhardt, et al., 1 Fla. Prac., Evidence § 901.5, there are substantial problems with the sheer breadth of circumstantial hoops being jumped through here. I do not believe that this circumstantial evidence—*even when combined*—crosses the threshold to authenticate the recordings.

In this reverse sting case, the police did not simultaneously listen or monitor the conversations in real time. Instead, they simply provided a handheld recorder to the paid confidential informant.[3] While the detective claimed the recordings were "immediately" sent, the record is devoid of the specific date and time when the detective received each recording. We do not know the time lag, if any, that occurred.

What is more, the paid confidential informant *still* has the recording device. There was no testimony that it, or the computer used to send it, was equipped with features to prevent tampering, alteration, or creation by other

---

device was capable of taking the conversation now offered in evidence. (2) That the operator of the device was competent to operate the device. (3) That the recording is authentic and correct. (4) That changes, additions or deletions have not been made in the recording. (5) That the recording has been preserved in a manner that is shown to the court. (6) That the speakers are identified. (7) That the conversation elicited was made voluntarily and in good faith, without any kind of inducement."); Sarro, 742 F.2d at 1292. In my opinion, the State's showing in this case would not meet any of these.

[3] It was described as an "old school" handheld recorder.

23

means. The device has not been tested since the initial test—*before* any of the recordings occurred. There also was no examination of the computer.

The detective testified that he would not know if the device malfunctioned. He similarly would not know if the recordings were altered or manipulated in some manner. See Parnell, 218 So. 2d at 541; Gomien, 172 So. 2d at 515; Lively, 803 F.2d at 1129; Sarro, 742 F.2d at 1292. Cf. Willingham v. State, 315 So. 3d 708, 712 (Fla. 4th DCA 2021) (finding surveillance video authenticated where "store owner testified a passcode is needed to access the shopping center's video recordings and he did not edit or tamper the recordings"); Richardson v. State, 228 So. 3d 131, 134 (Fla. 4th DCA 2017) ("Finally, there was testimony that the video equipment was kept in a locked office, which only one manager, besides the witness, had access to enter. This establishes a level of security protecting the recording, as opposed to equipment in the open for anyone to have access."). Phone or application records were not obtained to confirm that these calls even occurred. Cf. D.D.B. v. State, 109 So. 3d 1184, 1185 (Fla. 2d DCA 2013). Thus, the State failed to demonstrate reliability or security of the recording device involved, which is essential to lay the foundation. See United States v. Capers, 708 F.3d 1286, 1308 (11th Cir. 2013) ("Because there was no testimony about the fidelity of the audio equipment, and no independent

24

evidence of the accuracy of the audio recordings, the District Court should not have admitted the audio portion of the tape.") (internal citations omitted); see generally R.V. v. State, 388 So. 3d 952, 955 (Fla. 3d DCA 2024) (explaining under silent-witness theory, "a photograph may be admitted upon a showing of the reliability of the production process," which includes "procedural consideration relating to the preparation, testing, operation, and security of the equipment involved").

Simply put, the State did not present the quantum of evidence—*direct or circumstantial*—necessary to authenticate the audio recordings. It failed to demonstrate that the recording device was operating properly, the recorder operated in a proper manner, and the recordings were accurate. Parnell, 218 So. 2d at 541; Gomien, 172 So. 2d at 515. There are too many holes that cannot be plugged by the circumstantial evidence the majority points to.

Based on the foregoing, the trial court abused its discretion as the recordings were not shown to be a "faithful representation." Gulf Life Ins. Co. v. Stossel, 179 So. 163, 163 (Fla. 1938). Because this error is not harmless, the conviction and sentence should be reversed, and the case remanded for a new trial. Santana, 191 So. 3d at 948.

Above all, the purpose of authentication is to buttress reliability and filter untrustworthy evidence. It is "a necessary check on the perpetration of fraud." Jackson v. Household Fin. Corp. III, 298 So. 3d 531, 540 (Fla. 2020) (citing 2 McCormick on Evidence § 221 (7th ed. 2013)). Admission of untrustworthy, spurious, or fraudulent evidence could run afoul of the accused's constitutional right to confront the witnesses against him or her. See Amend. VI, U.S. Const.; Art. I, § 16(a), Fla. Const. It could deprive the accused of a fair and impartial trial. This is why it is vital for the State to carry its burden and present sufficient evidence to meet this threshold. It is critical for this line to be maintained to protect these fundamental rights. Judicial insistence that a proper foundation for authentication be laid safeguards against these violations.